124 T.C. No. 8


UNITED STATES TAX COURT


ESTATE OF WAYNE C. BONGARD, DECEASED, JAMES A. BERNARDS, PERSONAL
REPRESENTATIVE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6141-03.              Filed March 15, 2005.


        In 1980, D incorporated Empak, Inc.  In 1986, D
established an irrevocable stock accumulation trust (ISA
Trust) and funded it with some of his Empak stock.  In the
mid-1990s it was determined by Empak's board of directors
and advisers that pooling all of D's family's Empak stock in
a holding company, WCB Holdings, LLC. (WCB Holdings), would
better position Empak for a corporate liquidity event, which
was necessary to raise capital and remain competitive.  On
Dec. 28, 1996, D and ISA Trust capitalized WCB Holdings by
transferring to WCB Holdings their respective shares of
Empak stock, and in exchange received WCB Holdings class A
and class B membership units.  Each class of membership
units was further divided into governance and financial
units, the class A governance units being the only units
with voting rights.

        On Dec. 29, 1996, D and ISA Trust formed the Bongard
Family Limited Partnership (BFLP).  To capitalize BFLP, D
transferred all of his WCB Holdings class B membership units
to BFLP in exchange for a 99-percent limited partnership

interest, and ISA Trust transferred a portion of its WCB Holdings class B membership units to BFLP in exchange for a 1-percent general partnership interest. On Dec. 10, 1997, D made a gift of a 7.72-percent partnership interest to his wife. D made no other gifts of his BFLP interest before his death on Nov. 16, 1998.

The IRS issued a notice of deficiency to the estate on Feb. 4, 2003, which, among other things, returned to decedent's gross estate, under secs. 2035(a) and 2036(a) and (b), I.R.C., all of the Empak shares decedent had transferred to WCB Holdings.

The estate argues that sec. 2036(a), I.R.C., is not applicable to either D's transfer of Empak shares to WCB Holdings or D's transfer of his WCB Holdings class B membership units to BFLP because each transfer was a bona fide sale for adequate and full consideration. The estate argues, in the alternative, that even if the bona fide sale exception was not satisfied by each transfer, D did not retain a sec. 2036(a)(1) or (2), I.R.C., interest in the property he transferred in either transaction.

Held: D's transfer of his Empak stock to WCB Holdings satisfied the bona fide sale exception because D possessed a legitimate and significant nontax reason for the transfer.

Held, further, D's transfer of WCB Holdings class B membership units to BFLP did not satisfy the bona fide sale exception.

Held, further, an implied agreement existed whereby D retained a sec. 2036(a), I.R.C., interest in the WCB Holdings class B membership units he transferred to BFLP.

Held, further, WCB Holdings class B membership units allocable to the 7.72-percent partnership interest in BFLP D gave to his wife are included in D's gross estate under sec. 2035(a), I.R.C.

John W. Porter and Stephanie Loomis-Price, for petitioner.

Lillian D. Brigman and R. Scott Shieldes, for respondent.

GOEKE, Judge:  Respondent determined a \$52,878,785 Federal estate tax deficiency against the Estate of Wayne C. Bongard (the estate).  After concessions and stipulations, two issues remain for decision: First, whether the shares of Empak, Inc. (Empak), decedent transferred to WCB Holdings, LLC. (WCB Holdings), are included in his gross estate pursuant to sections 2035(a)[1] and 2036(a) and (b); and second, whether the WCB Holdings membership units decedent transferred to the Bongard Family Limited Partnership (BFLP) are included in his gross estate under sections 2035(a) and 2036(a).  The resolution of these issues depends on the applicability of section 2036(a) to decedent's respective transfers of Empak stock to WCB Holdings and of WCB Holdings membership units to BFLP.

## FINDINGS OF FACT

Many of the facts have been stipulated.  The stipulation of facts, stipulation of settled issues, and attached exhibits are incorporated herein by this reference.

Decedent resided in Minnesota on November 16, 1998, the date of his death.  On December 9, 1998, the First Judicial District Court, Probate Court Division, Carver County, Minnesota, appointed James A. Bernards (Mr. Bernards) personal

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are generally rounded to the nearest dollar.

representative of decedent's estate.  At the time the petition was filed, Mr. Bernards resided in Minnesota.  On February 4, 2003, respondent issued a notice of deficiency to the estate with respect to its timely filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.

## I.   General Background and Time Line

Decedent was a skilled and experienced businessman.  In 1966, decedent was a founding employee of Fluoroware, Inc. (Fluoroware), a Minnesota corporation that produced packaging materials for the semiconductor, data storage, and microelectronic industries.  In 1980, decedent left Fluoroware to start his own corporation, Empak.

On November 9, 1984, decedent married Cynthia Bongard. Decedent entered into this marriage with four children from a prior marriage: Beth Akerberg, Mark Bongard, Rhonda Notermann, and Lynn Zupan.  Cynthia Bongard also entered the marriage with a child from a previous marriage, Terra Saxe.[2]  Decedent and Cynthia Bongard never had any children together, nor did decedent adopt Terra Saxe.

On May 23, 1986, decedent formed the Wayne C. Bongard Irrevocable Stock Accumulation Trust (ISA Trust) for the benefit

---

[2]The parties stipulated that Terra is the correct spelling, but the Wayne C. Bongard Irrevocable Stock Accumulation Trust Agreement spells her name Tara.

of his children and Terra Saxe, and funded it with shares of Empak stock.  ISA Trust is described in further detail <u>infra</u> pp. 17-19.

On January 17, 1991, Empak incorporated Empak International, Inc. (Empak International), as a wholly owned subsidiary. Pursuant to a joint venture agreement, Empak sold an interest in Empak International to an unrelated foreign corporation.  See <u>infra</u> p. 8 for greater details of this joint venture.

Between April 22, 1991, and December 30, 1994, ISA Trust made six distributions of shares of Empak stock to specific beneficiaries.  After each distribution, Empak redeemed the shares from the distributee for cash.  See <u>infra</u> pp. 18-19 for specific details of these distributions/redemptions.

On January 30, 1996, WCB Holdings, LLC. (WCB Holdings) was established, but was not capitalized until December 28, 1996. Before WCB Holdings was capitalized, two significant events occurred.  First, on April 18, 1996, Empak had a stock split of 223 to 1, significantly increasing the number of shares decedent and ISA Trust owned.  See <u>infra</u> pp. 10-11 and p. 19. for details regarding the stock split and its effect it on the Empak shareholders.  Second, in February 1996, Empak incorporated Emplast, Inc. (Emplast), and capitalized it with some of Empak's noncore assets.  On July 31, 1996, Empak distributed its Emplast shares to decedent in exchange for some of his Empak shares,

which were canceled.  This transaction and its effects are discussed further infra pp. 10-11 and p. 19.

On December 28, 1996, decedent and ISA Trust transferred their respective shares of Empak stock to WCB Holdings in exchange for WCB Holdings membership units, which were divided into class A governance, class A financial, class B governance, and class B financial units.  For a greater discussion of this transaction, see infra pp. 11-14.

On December 29, 1996, decedent and ISA Trust created the Bongard Family Limited Partnership (BFLP).  Decedent transferred all of his WCB Holdings class B membership units to BFLP in exchange for a 99-percent limited partnership interest, and ISA Trust transferred a portion of its WCB Holdings class B membership units to BFLP in exchange for a 1-percent general partnership interest.  BFLP is discussed in further detail infra pp. 19-21.

On March 7, 1997, Empak International merged into Empak, which resulted in the foreign corporation's receiving an ownership interest in Empak and the cancellation of Empak's shares in Empak International.  Facts regarding this transaction are set forth infra pp. 14-15.

On March 15, 1997, decedent transferred WCB Holdings class A membership units to three trusts that he had previously established.  Each of these trusts was established to benefit

different members of his family. See infra pp. 21-23 for further details regarding these trusts. On December 10, 1997, decedent gave Cynthia Bongard a 7.72-percent limited partnership interest in BFLP. That same day, Cynthia Bongard and decedent entered into a postmarital agreement. See infra pp. 23-24 for details of the postmarital agreement.

Decedent died unexpectedly on November 16, 1998, while on a business/hunting trip in Austria. Decedent was 58 years of age and appeared to be in good health before his death.

## II. Decedent's Business Interests

### A. Empak

On July 14, 1980, decedent founded Empak as a Minnesota corporation. Decedent was assisted by Mr. Bernards, who was one of Fluoroware's outside accounting consultants, in incorporating Empak. Empak is an acronym for "electronic materials packaging". Empak engaged in the design, development, manufacture, and marketing of plastic products used in the semiconductor and data storage industries. Some of Empak's and Fluoroware's businesses directly competed with each other.

Decedent was Empak's sole shareholder upon incorporation. Empak had only one class of stock, common voting stock. When decedent funded the ISA Trust with shares of Empak stock in 1986, decedent's ownership percentage decreased to 85 percent. Decedent was also one of three directors on Empak's board of

directors.  In the mid-1980s, decedent became the sole member of Empak's board of directors and remained in that position until his death, except for a 28-day period from December 30, 1996, to January 24, 1997.

Empak grew into a successful business through decedent's leadership.  Empak's growth was attributable to selling a greater number and variety of products, expanding its markets, reinvesting its earnings, and borrowing funds.  Empak, however, never declared a dividend.

B. Empak, Marubeni Corp., and Marubeni America Corp. Joint Venture

In the 1980s, Empak, Marubeni Corp. (MC), and Marubeni America Corp. (MAC) engaged in a joint venture to produce plastic compact disk containers (a.k.a. jewel boxes).  MC was a Japanese trading entity with over 700 subsidiaries and was listed on numerous international stock exchanges.  MAC was the U.S. sales and marketing subsidiary of MC.  Basically, MC financed and provided materials for the joint venture and Empak manufactured the jewel boxes.

C. Empak's Incorporation of Empak International

On January 17, 1991, Empak incorporated Empak International, Inc., a wholly owned Minnesota subsidiary organized to distribute, sell, and manufacture a proprietary line of computer disk and semiconductor packaging products outside the United States and Canada.  The formation of Empak International was a

function of the joint venture agreement between Empak and MC. Pursuant to Empak International's shareholder agreement, Empak sold 49 percent of Empak International's common stock to MC for $3,765,000 but remained the majority shareholder with a 51-percent interest. During 1992 and 1993, Mark Bongard was employed by Empak International as vice president of sales and marketing.

D.   Planning for Corporate Liquidity

At a meeting in 1995, decedent, Robert Boyle (Mr. Boyle), Mr. Bernards, and Chuck Eitel (Mr. Eitel), then president of Empak, discussed various business plans for Empak to remain competitive in the market. Mr. Boyle began representing decedent's various business interests while he was an attorney at Larkin, Hoffman, Daly & Lindgren, Ltd. (Larkin Hoffman). Mr. Boyle left Larkin Hoffman in 1995 but continued his professional relationship with decedent. As part of these discussions, Mr. Boyle envisioned the necessary steps to position Empak for a corporate liquidity event, which the discussants agreed would provide Empak with the necessary capital to remain competitive. A corporate liquidity event included either a public or private offering of Empak stock. Mr. Boyle handwrote notes during this meeting. These contemporaneous handwritten notes indicate that a single holding company, to hold all the Empak stock owned by the Bongard family, was going to be established as part of this

business plan.  As explained hereinafter, the formation of BFLP was part of decedent's estate plan and not contemplated as a necessary step in positioning Empak for a corporate liquidity event.  On December 22, 1995, Mr. Boyle provided decedent with a letter memorializing the steps associated with obtaining corporate liquidity.  Many of these integrated steps were completed before decedent's death.

### 1. Empak's Incorporation and Spinoff[3] of Emplast

On February 21, 1996, Empak incorporated a wholly owned subsidiary, Emplast.  Emplast was incorporated and capitalized with noncore assets of Empak to streamline Empak in preparation for a corporate liquidity event.  The noncore assets consisted of assets outside of Empak's semiconductor business.  The net book value of these assets was $5,752,854, which represented 5 percent of Empak's net book value.  Mark Bongard was appointed the chief executive officer of Emplast and remained in that position until decedent's death.

Empak had a stock split on April 18, 1996, which was approved by a vote of the outstanding Empak stockholders.  Empak shareholders received 223 shares for each Empak share held, which increased decedent's number of shares to 5,686,500.  The stock split also increased ISA Trust's number of shares.  See infra p.

---

[3]The parties' stipulation terms this transaction as a "spinoff".  However, it appears that the distribution was a splitoff.

19. The day following Empak's stock split, decedent in his capacity as Empak's sole member on its board of directors adopted a resolution authorizing grants of incentive stock options and nonqualified stock options. It does not appear that any of these stock options were exercised before decedent's death.

On July 31, 1996, Empak distributed the stock of Emplast to decedent. In exchange for receiving 100 percent ownership of Emplast, 551,871 of decedent's shares in Empak were canceled. This decreased decedent's ownership interest in Empak to 5,134,629 shares, or 86.39 percent. Because some of decedent's shares were canceled and ISA Trust did not participate in the distribution, ISA Trust's ownership percentage in Empak increased to 13.61 percent. ISA Trust's percentage holding of Empak had decreased after 1986 due to the redemptions of some of the Empak stocks held by the trust.

### 2. WCB Holdings

In view of market conditions in 1996, Mr. Boyle determined that investors would be more likely to invest in Empak if the Bongard family members' ownership interests were placed in a holding company. As of December 1996, decedent and ISA Trust held all of the Empak stock. Decedent had established the ISA Trust on May 23, 1986, with the assistance of John Fullmer (Mr. Fullmer) and Mr. Boyle. When ISA Trust was established, Messrs. Fullmer and Boyle were both attorneys with Larkin Hoffman, but in

1996 only Mr. Fullmer was with Larkin Hoffman.  In 1996, Mr.
Boyle, who continued to represent decedent's business interests
after leaving Larkin Hoffman, informed Mr. Fullmer, decedent's
estate planning attorney, that decedent's Empak stock was going
to be transferred to a holding company as part of the overall
plan to achieve corporate liquidity.

On January 30, 1996, Mr. Boyle, on behalf of decedent,
organized WCB Holdings as a Minnesota limited liability company
(WCB Holdings).  Its articles of organization (articles), as
amended, authorized the issuance of class A governance, class A
financial, class B governance, and class B financial units.  The
class A governance units were the sole membership units with
voting rights except as provided under State law.[4]

On December 28, 1996, decedent contributed his 5,134,629
shares of Empak stock to WCB Holdings.  Decedent received in
exchange 513,463 class A governance, 513,463 class A financial,
4,621,166 class B governance, and 4,621,166 class B financial
membership units in WCB Holdings.  This gave decedent an 86.39-
percent ownership interest in each subclass of WCB Holdings
membership units.  ISA Trust also contributed its 808,598 shares
of Empak stock to WCB Holdings and received 80,860 class A

---

[4]Minn. Stat. Ann. sec. 322B.155 in effect in 1996 generally
provided voting rights for any class of membership units, whether
or not the articles of organization provided such units voting
rights, only if the rights or interests attached to that class
could be affected by a proposed change.

governance, 80,860 class A financial, 727,738 class B governance, and 727,738 class B financial units.  This gave ISA Trust a 13.61-percent ownership interest in each subclass of WCB Holdings membership units.  Decedent and ISA Trust received WCB Holdings class A governance, class A financial, class B governance, and class B financial membership units in proportion to the number of Empak shares each contributed.[5]

On December 28, 1996, Mark Bongard was elected chief manager, secretary, and treasurer of WCB Holdings.  According to the Member Control Agreement, the chief manager is the person "duly elected or appointed pursuant to the terms of this Agreement to manage the business of the Company."  Some of the chief manager's duties include general management, presiding at meetings, overseeing that orders and resolutions are carried out, maintaining records and certifying proceedings, and signing and delivering WCB Holdings documents.

Limitations were placed on the chief manager's powers.  For instance, the Member Control Agreement provided that the chief manager was not granted sole decisionmaking authority over the

---

[5]It appears the number of class A governance units and class A financial units issued to each member was determined by multiplying the number of Empak shares the respective shareholder contributed by 10 percent, rounded to the nearest share.  The number of class B governance units and class B financial units issued to each member was then calculated by decreasing the number of Empak shares contributed by 10 percent of the number of Empak shares contributed, rounded to the nearest share.

allocation of distributions. If a distribution were authorized, it would be allocated according to the number of class A financial and class B financial units owned. The chief manager was also charged with the decisionmaking for accounting matters, except if the members representing a majority of class A governance units disagreed. The members by a majority vote of the class A governance units could take any action the chief manager himself could take and could remove the chief manager. Lastly, the chief manager needed the approval of the members representing the majority of the class A governance units before he could issue additional membership units, lend, borrow, or commit WCB Holdings's funds in excess of $25,000, authorize capital expenditures in excess of $10,000, sell any of WCB Holdings's assets, including its Empak stock, worth over $10,000 in any 12-month period, or vote any securities, including its Empak stock, owned by WCB Holdings.

On December 30, 1996, 2 days after WCB Holdings was capitalized, a vote was held to increase the number of Empak directors to two. The WCB Holdings chief manager did not vote on this change, even though WCB Holdings was the sole shareholder of Empak stock. Rather, decedent and Mr. Boyle, as trustees for the ISA Trust, voted for this change.

### 3. Empak International's Merger Into Empak

On March 7, 1997, Empak International merged into Empak. As part of the merger, MC's stock in Empak International was canceled and MC received, among other things, 660,359 shares of Empak common stock and an option to purchase 58,667 additional shares of Empak common stock. Empak's stock in Empak International was canceled.

Pursuant to the merger, Empak assumed responsibility for the foreign distribution of Empak products with the exception of Japan. Empak appointed MAC as the exclusive exporter of Empak products to Japan and MC as the exclusive distributor of Empak products in Japan. Empak's ownership was altered as a result of the merger of Empak International into Empak as follows:

| Empak shareholder | Number of shares | Percentage of total |
|---|---|---|
| WCB Holdings | 5,943,227 | 90% |
| MC | 396,215 | 6 |
| MAC | 264,144 | 4 |
| Total | 6,603,586 | 100 |

### E. Consolidation of Empak and Fluoroware

In the summer of 1998, Empak and Fluoroware began consolidation discussions. Decedent engaged in the discussions in his capacity as chairman of the board and chief executive officer of Empak. Before November 1998, decedent had sketched out potential organizational structures in the event the

corporations consolidated, but Empak and Fluoroware did not agree to specific details regarding the consolidation before decedent's death.  Following decedent's unexpected death on November 16, 1998, consolidation discussions were renewed.

On February 5, 1999, Mr. Bernards, who assisted in representing Empak in the discussions, recommended the approval of a consolidation between Empak and Fluoroware.  On March 15, 1999, Empak and Fluoroware signed a letter of intent to consummate the general terms of the consolidation.  Between April 13 and 14, 1999, Mr. Boyle, as corporate secretary of Empak, prepared and filed Federal Trade Commission (FTC) Form 4 (a.k.a. Hart-Scott-Rodino filing), with the FTC indicating the parties' intended consolidation.  Mark Bongard, as chief manager of WCB Holdings, gave notice of a special meeting to its members to consider the proposed consolidation, which was approved by the members.  On June 1, 1999, Empak and Fluoroware entered into a consolidation agreement which provided for the formation of a new corporation, Entegris, Inc. (Entegris).  Pursuant to the new consolidation agreement, Empak shareholders received 10,250,789 Entegris shares, which represented a 40-percent ownership interest.

On March 31, 2000, Entegris filed a registration statement with the Securities and Exchange Commission in anticipation of its initial public offering (IPO).  On July 11, 2000, Entegris

had a 2-for-1 stock split, resulting in WCB Holdings's owning 21,580,608[6] shares of Entegris stock. Also on July 11, 2000, Entegris completed its IPO. WCB Holdings sold 1,925,000 shares of Entegris as part of the Entegris IPO.

III. Decedent's Estate Planning

Decedent sought counsel, considered advice, and worked on his estate planning from at least 1984. In 1984, decedent did not want either his children or Cynthia Bongard to directly own Empak stock. Decedent engaged Larkin Hoffman for estate and business planning purposes.

A. ISA Trust

On May 23, 1986, decedent established ISA Trust with the assistance of Larkin Hoffman. ISA Trust was initially funded by decedent's transfer of 4,500 of Empak's 30,000 outstanding shares, which represented a 15-percent ownership interest in Empak. The beneficiaries of ISA Trust were decedent's four children and Terra Saxe. The initial trustees of ISA Trust were Mr. Bernards and Larry Welter, an employee of Empak. The trustees were granted the power to distribute the trust's income or principal to any beneficiary acquiring a home or establishing and maintaining a trade or business. On February 14, 1988, Mr.

---

[6]It appears the Empak shareholders received an additional 539,515 shares of Entegris stock pursuant to the consolidation agreement on the first anniversary of the closing date (June 7, 1999).

Bernards resigned as trustee of ISA Trust, leaving Mr. Welter as sole trustee.

ISA Trust made six distributions between April 22, 1991, and December 30, 1994. Each distribution was preceded by decedent's requesting the trustee or trustees to consider making the distribution. After each distribution, an entry was made in Empak's stock register recording ISA Trust's distribution of Empak shares to a particular beneficiary. Empak and the named distributee would enter into a stock redemption agreement at approximately the same time as the distribution. The stock redemption agreements provided for Empak to redeem the distributed shares if the distributee was willing.

The first distribution occurred on April 22, 1991. ISA Trust distributed 150 shares of Empak stock to Mark Bongard, who then caused Empak to redeem the shares on May 1, 1991, for $40,000, which he used to purchase a home. The second distribution of 180 shares of Empak stock occurred on August 31, 1992. Beth Akerberg was the recipient of this distribution, which was shortly followed by a redemption of the shares by Empak in exchange for a 90-day note. On February 1, 1994, ISA Trust distributed 250 shares of Empak stock to Lynn Zupan. On the same day, Empak redeemed the 250 shares from Lynn Zupan. Empak paid a portion of the redemption proceeds directly to a third party who had performed home improvement work on Lynn Zupan's home. The

fourth, fifth, and sixth distributions all occurred on December 30, 1994. Mark Bongard, Rhonda Notermann, and Beth Akerberg were the recipients of 85, 151, and 58 shares of Empak stock, respectively, all of which were apparently redeemed by Empak. Following these six distributions, ISA Trust held 3,626 shares of Empak stock which represented a 12.45-percent ownership interest.

On January 5, 1995, Mr. Welter appointed Mark Bongard and Mr. Boyle as cotrustees of ISA Trust; he then resigned as trustee. Mark Bongard and Mr. Boyle accepted their appointments on January 10 and 18, 1995, respectively. Mr. Boyle and Mark Bongard later reappointed Mr. Bernards as an additional ISA Trust trustee on October 1, 1997.

When Empak's stock was split 223 to 1 on April 18, 1996, ISA Trust's number of Empak shares increased to 808,598. When Empak distributed to decedent its Emplast stock on July 31, 1996, ISA Trust continued to hold 808,598 shares of Empak. ISA Trust's ownership percentage of Empak was 13.61 percent at that time.

B. Bongard Family Limited Partnership

On December 28, 1996, decedent signed a letter that was written by Mr. Fullmer and addressed to decedent's children. The letter expressed some reasons for forming WCB Holdings and BFLP. The letter explained that the entities provided, among other things, a method for giving assets to decedent's family members without deterring them from working hard and becoming educated,

protection of his estate from frivolous lawsuits and creditors, greater flexibility than trusts, a means to limit expenses if any lawsuits should arise, tutelage with respect to managing the family's assets, and tax benefits with respect to transfer taxes.

On December 29, 1996, decedent contributed all of his 4,621,166 WCB Holdings class B governance and 4,621,166 WCB Holdings class B financial units to BFLP in exchange for a 99-percent limited partnership interest in BFLP. ISA Trust contributed 46,678 WCB Holdings class B governance and 46,678 WCB Holdings class B financial units to BFLP and received a 1-percent general partnership interest in exchange. Mr. Boyle (as trustee of ISA Trust), decedent, and Mr. Fullmer (as decedent's estate planning counsel) negotiated the terms of the partnership, and explained the partnership to Mark Bongard (cotrustee of ISA Trust) before the partnership agreement was executed. Pursuant to the partnership agreement, either decedent, as limited partner, or ISA Trust, as general partner, could propose amendments to the partnership. For a proposed amendment to be adopted, both the general partner, ISA Trust, and 60 percent of the limited partnership interests needed to vote in favor of the amendment. BFLP was validly created and existing under Minnesota law until decedent's death.

In the event BFLP liquidated, its assets were first to be allocated to satisfy its creditors, other than the general

partner, limited partners, or assignees, second, to satisfy any liabilities owed to the interest holders,[7] and third, to satisfy any liabilities owed to the general partner.  Any remaining assets were to be allocated among the general partner, limited partners, or assignees in accordance with their respective capital accounts.

C.  Additional Trusts Created by Decedent

On December 28, 1996, decedent created the Wayne C. Bongard Children's Trust (CH Trust), and appointed Mark Bongard and Mr. Bernards as trustees.  Decedent initially funded the CH Trust on March 15, 1997, with 77,262 class A governance and 77,262 class A financial units in WCB Holdings.

On December 30, 1996, decedent created the Wayne C. Bongard Grandchildren's Trust (GC Trust).  The trust agreement was drafted by Mr. Fullmer.  Decedent appointed Del Jensen and Mr. Eitel, both of whom were employed by Empak, as trustees. Decedent funded GC Trust on March 15, 1997, by transferring 77,262 class A governance and 77,262 class A financial units in WCB Holdings.  Decedent's children and issue were the named beneficiaries of GC Trust.

---

[7]Pursuant to the partnership agreement, an interest holder is a holder of an "interest".  An "interest" is "an ownership interest in the Partnership [held] by a Limited Partner (or an assignee)".

On December 30, 1996, decedent created the Cynthia F. Bongard Qualified Terminable Interest Property Trust (QTIP Trust). The QTIP Trust agreement was drafted by Mr. Fullmer. Gary Bongard (decedent's brother) and Gary Brown (decedent's friend) were appointed trustees of this trust. The named beneficiaries of QTIP Trust were Cynthia Bongard, decedent's children, and their issue. On March 15, 1997, QTIP Trust was funded by decedent with 71,319 class A governance and 71,319 class A financial units in WCB Holdings.

Decedent formed the Wayne C. Bongard Revocable Trust (Revocable Trust) on December 28, 1996. Decedent appointed himself trustee, Mr. Bernards successor trustee, and Mark Bongard second successor trustee. According to decedent's last will and testament dated December 28, 1996, all of his property was to go to the Revocable Trust, except his personal property was to go to Cynthia Bongard.

Decedent's funding of GC Trust, CH Trust, and QTIP Trust changed the ownership interests in WCB Holdings so that they were held as follows:

| WCB Holdings member | Class A governance units/percent | Class A financial units/percent | Class B governance units/percent | Class B financial units/percent |
|---|---|---|---|---|
| Decedent | 287,620/48.39 | 287,620/48.39 | 0/0 | 0/0 |
| ISA Trust | 80,860/13.61 | 80,860/13.61 | 681,060/12.73 | 681,060/12.73 |
| BFLP | 0/0 | 0/0 | 4,667,844/87.27 | 4,667,844/87.27 |
| CH Trust | 77,262/13 | 77,262/13 | 0/0 | 0/0 |
| GC Trust | 77,262/13 | 77,262/13 | 0/0 | 0/0 |
| QTIP Trust | 71,319/12 | 71,319/12 | 0/0 | 0/0 |
| Total | 594,323/100 | 594,323/100 | 5,348,904/100 | 5,348,904/100 |

Decedent reported the funding of CH Trust, GC Trust, and QTIP trust on a Federal gift tax return for 1997. The values reported on the gift tax return were consistent with a valuation report prepared as of December 15, 1996, before WCB Holdings's formation.

D. Decedent's Transfer of BFLP Interest to Cynthia Bongard

On December 10, 1997, decedent made a gift representing a 7.72-percent ownership interest in BFLP to Cynthia Bongard. BFLP's ownership was then as follows:

| BFLP partner | Partnership interest & type |
|---|---|
| ISA Trust | 1%, general partner |
| Decedent | 91.28%, limited partner[1] |
| Cynthia | 7.72%, limited partner |

[1] Decedent owned this interest until his death.

Decedent did not report this gift on his gift tax return filed for taxable year 1997, as the marital gift tax exclusion was applicable. Cynthia Bongard and decedent entered into a postmarital agreement contemporaneously with the transfer. This agreement was "in full discharge, settlement, and satisfaction of all such rights and claims [either spouse may have possessed against the other], in the event of the termination of their marital relationship or after the death of the first of them to die".

E. Purpose and Function of BFLP

From its inception until decedent's death, BFLP did not perform any activities, never acted to diversify its assets, or make any distributions. The WCB Holdings membership units in BFLP were nonvoting, and decedent determined whether the Empak shares held by WCB Holdings would be redeemed. WCB Holdings did not redeem any of its class B membership units held by BFLP before decedent's death.

F. 1998 ISA Trust Distribution

In early 1998, decedent suggested that ISA Trust make distributions to each of his children to see how maturely they would handle the funds. A series of transactions occurred in which Empak redeemed 52,924 of its outstanding shares from WCB Holdings, and WCB Holdings then redeemed 21,345 of its class A and class B financial units from ISA Trust. This redemption

generated $747,816.12.  After covering tax liabilities of all WCB Holdings members, WCB Holdings and in turn ISA Trust distributed $400,000 in four equal shares to decedent's four children.  The ownership interests in WCB Holdings were changed so that they were held as follows:

| WCB Holdings member | Class A governance units/percentage | Class A financial units/percentage | Class B governance units/percentage | Class B financial units/percentage |
|---|---|---|---|---|
| Decedent | 287,620/ 48.39% | 287,620/ 50.2 | 0/ 0 | 0/ 0 |
| ISA Trust | 80,860/ 13.61 | 59,515/ 10.39 | 681,060/ 12.73 | 659,715/ 12.38 |
| BFLP | 0/ 0 | 0/ 0 | 4,667,884/ 87.27 | 4,667,864/ 87.62 |
| CH Trust | 77,262/ 13 | 77,262/ 13.48 | 0/ 0 | 0/ 0 |
| GC Trust | 77,262/ 13 | 77,262/ 13.48 | 0/ 0 | 0/ 0 |
| QTIP Trust | 71,319/ 12 | 71,319/ 12.45 | 0/ 0 | 0/ 0 |
| Total | 594,323/100 | 572,978/100 | 5,348,944/100 | 5,327,579/100 |

IV.  The Estate of Wayne C. Bongard

The estate filed a Federal estate tax return on February 15, 2000.  For Federal estate tax purposes, the estate elected the alternate valuation date of May 16, 1999.  On February 15, 2000, the estate completed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, which reported that the Federal estate tax owed was $17,004,363.  The estate attached Schedule F, Other Miscellaneous Property Not Reportable Under Any Other Schedule, to its Form 706.  Schedule F showed the alternate values of decedent's WCB Holdings class A membership units and his 91.28-percent limited partnership interest in BFLP to be $4,193,000 and $41,329,838, respectively.  On February 4, 2003,

respondent issued to the estate a notice of deficiency, that determined a Federal estate tax deficiency of $52,878,785. In the notice of deficiency, respondent adjusted the values attached by the estate to many assets in decedent's gross estate. In addition, respondent determined that the 5,134,629 shares of Empak stock decedent transferred to WCB Holdings were includable in decedent's gross estate because decedent had retained sections 2035(a) and 2036(a) and/or (b) rights and interests in the transferred property. On the estate tax return, the estate reported values of the WCB Holdings class A units and BFLP interest held by decedent at his death totaling $45,523,338. Respondent in the notice of deficiency included in the gross estate a value for decedent's Empak shares that had been transferred to WCB Holdings totaling $141,621,428.[8] This resulted in an adjustment increasing the gross estate by $96,098,120.

Prior to trial, respondent amended the answer to seek an increased deficiency based upon the parties' agreement that the starting price of Empak shares before any discounts was $32.24.

---

[8]This adjustment would include in the gross estate the value of the Empak shares previously held by decedent and transferred to WCB Holdings, including the Empak share value related to the WCB Holdings class B membership units that were transferred to BFLP.

Using this value, respondent's counsel estimated the revised adjustment to decedent's gross estate could be as high as $160 million.

OPINION

A Federal estate tax is imposed "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a). The estate tax is imposed on the value of the taxable estate with specified adjustments made. Sec. 2001(b). A decedent's taxable estate is determined by the value of the decedent's gross estate less enumerated deductions. Sec. 2051. The value of a gross estate includes all of a decedent's property to the extent provided under sections 2033 through 2045. Sec. 2033. At issue here is whether certain property decedent transferred during his lifetime is included in his gross estate under sections 2035(a) and 2036(a) and (b).

I. Burden of Proof

The estate argues that under section 7491(a) the burden of proof has shifted to respondent. Conversely, respondent contends the burden has not shifted because the estate was not cooperative within the meaning of section 7491(a), and because the estate failed to introduce credible evidence necessary for the burden to shift. It is unnecessary for us to address the parties' disagreements and to determine whether the burden of proof has shifted because the outcome of this case is determined on the

preponderance of the evidence and is unaffected by section 7491.
See <u>Blodgett v. Commissioner</u>, 394 F.3d 1030, 1035 (8th Cir.
2005), affg. T.C. Memo. 2003-212; <u>Estate of Stone v.
Commissioner</u>, T.C. Memo. 2003-309.

II. <u>Sections 2035(a) and 2036(a)</u>

The purpose of section 2036 is to include in a deceased
taxpayer's gross estate inter vivos transfers that were
testamentary in nature. <u>United States v. Estate of Grace</u>, 395
U.S. 316 (1969). Section 2036(a)[9] generally provides that if a
decedent makes an inter vivos transfer of property, other than a
bona fide sale for adequate and full consideration, and retains
certain enumerated rights or interests in the property which are

---

[9]SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

    (a) General Rule.--The value of the gross estate
shall include the value of all property to the extent
of any interest therein of which the decedent has at
any time made a transfer (except in case of a bona fide
sale for an adequate and full consideration in money or
money's worth), by trust or otherwise, under which he
has retained for his life or for any period not
ascertainable without reference to his death or for any
period which does not in fact end before his death--

        (1) the possession or enjoyment of, or
the right to the income from, the property,
or

        (2) the right, either alone or in
conjunction with any person, to designate the
persons who shall possess or enjoy the
property or the income therefrom.

not relinquished until death, the full value of the transferred property will be included in the decedent's gross estate. Section 2036(a) is applicable when three conditions are met: (1) the decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent retained an interest or right enumerated in section 2036(a)(1) or (2) or (b)[10] in the transferred property which he did not relinquish before his death.

Additionally, pursuant to section 2035(a) a decedent's gross estate includes the value of any property in respect of which the decedent made a transfer or relinquished a power within 3 years of his death if the value of such property would have been included in the decedent's gross estate under section 2036 but for the decedent's transfer of an interest in the property or the decedent's relinquishment of a power with respect to the property.

This case focuses on each aspect of section 2036(a). The estate argues that decedent's transfer of Empak stock to WCB Holdings and decedent's transfer of WCB Holdings class B membership units to BFLP: (1) did not constitute "transfers"

---

[10] Sec. 2036(b) instructs that the retention of the right to vote shares of a controlled corporation that were transferred by a decedent is the retention of the enjoyment of the transferred property.

under section 2036, (2) satisfied the bona fide sale exemption, and (3) did not include the retention of section 2036 interests.

A.  "Transfer" and Section 2036(a)

The first question is whether decedent, in fact, made a lifetime transfer.  See United States v. O'Malley, 383 U.S. 627, 631 (1966) (stating the purpose behind the predecessor to section 2036(a) was to tax all property that had been the "subject of an incomplete inter vivos transfer").

The term "transfer", as used in section 2036, is broadly defined.  See Helvering v. Hallock, 309 U.S. 106, n.7 (1940); Estate of Shafer v. Commissioner, 749 F.2d 1216, 1221-1222 (6th Cir. 1984), affg. 80 T.C. 1145 (1983); Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971) (stating that section 2036 "describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death").  The interpretation of the term "transfer" must reflect the purpose of section 2036(a), which is to include in a decedent's gross estate all property he transferred but retained an interest therein during his lifetime. See United States v. Estate of Grace, supra at 322; Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (citing United States v. Estate of Grace, supra at 320); Estate of Shafer v. Commissioner, supra (citing Foster v. United States, 303 U.S.

118, 120 (1938)).  Thus, the caselaw does not support a narrow definition of the term "transfer", but instead indicates a section 2036 analysis should begin by determining whether the decedent made an inter vivos voluntary act of transferring property.  Estate of DiMarco v. Commissioner, 87 T.C. 653, 662-663 (1986).  Any such act, including decedent's transfer of his Empak shares to WCB Holdings and decedent's transfer of his WCB Holdings class B financial and class B governance units, is included in a broad interpretation of the term "transfer".

B.  The Bona Fide Sale Exception

As previously stated, Congress excepted from section 2036(a) any transfer made in a "bona fide sale for an adequate and full consideration" (the bona fide sale exception).  Respondent argues that decedent's inter vivos transfers to WCB Holdings and BFLP should not be allowed to deplete the gross estate because sections 2035(a) and 2036(a) and (b) are applicable.  The estate urges us to respect the transfers, arguing each satisfied the bona fide sale exception.  This exception has frequently been the grist of judicial interpretation.

In Estate of Harrison v. Commissioner, T.C. Memo. 1987-8, we determined that a partnership agreement was not a substitute for a testamentary disposition since the decedent received "adequate consideration for his transfer to the partnership."  On June 10, 1975, the decedent was in poor health and executed a power of

attorney appointing his son as his attorney-in-fact. On August 1, 1979, the decedent's son, acting individually and under the power of attorney, organized a family limited partnership for purposes of consolidating and preserving the decedent's assets. Some of the assets the decedent contributed included oil and gas assets, which required active management. The decedent's 77.8-percent limited partnership interest and 1-percent general partnership interest were proportionate to the value of the property he transferred. The decedent's sons each received 10.6-percent general partnership interests. The decedent died on January 14, 1980. We held that the formation of the partnership was not a testamentary disposition for two reasons significant to this discussion. First, the decedent received adequate and full consideration for his transfer. Second, because the estate was able to show that the partnership was created for the business purpose of providing the necessary and proper management of the decedent's properties.

In Estate of Harper v. Commissioner, T.C. Memo. 2002-121, the Court held the bona fide sale exception was not satisfied. On December 18, 1990, the decedent created a revocable trust. The trust instrument named the decedent the initial trustee. The decedent formed a limited partnership in which his two children received a combined 1-percent general partnership interest and the trust received a 99-percent limited partnership interest.

The decedent never consulted with his children regarding how the partnership was going to be operated or structured.

As part of the analysis the Court stated that the applicability of the bona fide sale exception depends on two requirements: "(1) A bona fide sale, meaning an arm's-length transaction, and (2) adequate and full consideration." The alleged nontax purpose for creating the partnership was to manage and invest the assets contributed. However, the facts revealed that no new investment strategies were employed by the partnership, nor did any of the assets constitute working assets as in Estate of Harrison v. Commissioner, supra. Moreover, the estate failed to identify the property, if any, the decedent's children transferred to him or the partnership in exchange for their partnership interests. See Estate of Reichardt v. Commissioner, 114 T.C. 144, 155 (2000) (holding that there was no adequate and full consideration where, among other things, the decedent's children transferred nothing to him or the partnership). A circuitous recycling of value occurred because the pooled assets were significantly composed of the same property contributed by the trust to the partnership.

In Estate of Thompson v. Commissioner, T.C. Memo. 2002-246, affd. 382 F.3d 367 (3d Cir. 2004), we again held the bona fide sale exception was not applicable. On January 16, 1969, the decedent established a revocable trust. The trust agreement was

amended, and the trust was funded with securities and cash on March 17, 1993. The decedent received income from the securities held in the trust. In early 1993, the decedent's children and the decedent met with a financial adviser and an attorney who described for the decedent an estate plan that used family limited partnerships. The decedent agreed to form two limited partnerships to benefit his two children. Two new corporations were incorporated, each serving as general partner to one of the partnerships. The decedent received shares of stock that represented a 49-percent ownership interest in each newly formed corporation. Before forming the partnerships and corporations, the decedent and his two children agreed that he would be taken care of financially. Additionally, they wanted decedent to have access to money in each partnership in order to continue making gifts to his family. With respect to the adequate and full consideration prong, the substance of the transaction revealed that there was not a true pooling of assets. The income from some of the properties each partner contributed was allocated to that partner. The partnerships also failed to change the investment strategy of their principal assets--the stocks and bonds contributed by the decedent. The lack of nontax business reasons for the transfer further supported the conclusion that the decedent did not receive adequate and full consideration within the meaning of section 2036(a). Finally, the Court

determined that the partnership was conducted in a testamentary manner, rather than in a businesslike manner, because the decedent's money was used to finance the needs of individual family members including himself. On these findings, we held that the bona fide sale exception was not applicable.

In Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, the decedent executed a power of attorney in 1988 that named his son-in-law, Mr. Gulig, his attorney-in-fact. In 1993, the decedent's health began to deteriorate, and Mr. Gulig took over the decedent's personal affairs. On August 12, 1994, Mr. Gulig, as the decedent's attorney-in-fact, independently created the Strangi Family Limited Partnership (SFLP) and Stranco, Inc. (Stranco), the corporate general partner of SFLP. Mr. Gulig singlehandedly determined how the SFLP would be structured and operated. Mr. Gulig assigned 98 percent of the decedent's wealth to the SFLP in exchange for a 99-percent limited partnership interest. The assets contributed by the decedent included, among other things, his personal residence, securities, and insurance policies. The decedent and Mrs. Gulig (the decedent's daughter and Mr. Gulig's wife), purchased Stranco shares for cash. The decedent purchased a 47-percent interest in Stranco. Stranco contributed the cash to SFLP for a 1-percent general partnership interest. The Stranco shareholders acting in concert delegated

its managing powers to Mr. Gulig. The decedent died on October 14, 1994.

We determined that the formation of the SFLP was not an arm's-length transaction because Mr. Gulig, as the decedent's attorney-in-fact, established and operated SFLP without any meaningful negotiations, essentially standing on both sides of the transaction. Moreover, the Court determined that Mr. Gulig recycled the value of the decedent's assets through the partnership or corporate solution since the decedent contributed more than 99 percent of the total combined property in SFLP and Stranco and received an interest with a value derived "almost exclusively" from the assets he contributed rather than from a true pooling of assets. None of the contributed assets were found to be of the sort qualifying as a "functioning business enterprise" as discussed in Estate of Harrison v. Commissioner, T.C. Memo. 1987-8. Accordingly, in Strangi we held that the bona fide sale exception was not satisfied.

Shortly thereafter, the Court in Estate of Stone v. Commissioner, T.C. Memo. 2003-309, held that the bona fide sale exception in section 2036(a) was satisfied. In Estate of Stone, the decedent spouses (the Stones) had operated a successful closely held business for a number of years and created five family limited partnerships. We rejected the Commissioner's argument that the formation of each of the family limited

partnerships was not "motivated primarily by legitimate business concerns". A reason for employing the limited partnership concept was to resolve the Stones' children's concerns. There were significant intrafamily disputes with regard to the Stones' assets which led to litigation.

The Court found that the future management of the Stones' assets by the children qualified as a legitimate business concern since they were going to succeed their parents in operating the business. The children actively managed the assets that were contributed to the partnership in which they had their respective interests. These facts supported a finding that each partnership had economic substance and was not merely a circuitous recycling of value. Additionally, the Stones were both in good health for most of the time the negotiations concerning the formation of the partnerships were taking place, and they retained sufficient assets outside of the partnerships to meet their personal needs. We also concluded that the terms of the transactions reflected arm's-length dealing. The Stones determined which assets would be contributed to the partnerships, and Mr. Stone's attorney drafted the partnership agreements, but the children each had counsel representing their individual interests.

The adequate and full consideration prong was also deemed satisfied. All partners in each partnership received interests proportionate to the fair market value of the assets they each

transferred, and partnership legal formalities were respected. We rejected the Commissioner's argument that valuation discounts attached to the partnership interest the decedent received precluded the adequate and full consideration prong from being satisfied. We reasoned that the Commissioner's argument effectively read "out of section 2036(a) the exception that Congress expressly prescribed when it enacted that statute". We found that the partnerships had economic substance as a joint venture for profit in which there was a genuine pooling of property and services.

This Court had another opportunity to consider the application of section 2036(a) and the bona fide sale exception in Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46. The decedent's estate argued that the creation of the limited partnership was motivated by a business purpose and premarital protection of the decedent's assets. The Court rejected the estate's contention that the partnership served as a means of premarital asset protection. On that point, the Court determined that because title to the properties remained in the decedent's name until after her death, and she was financially dependent on the distributions from the partnership, the transaction was not a bona fide sale, but rather was a paper transaction. The estate was unable to establish a credible nontax reason for engaging in the transaction, nor was it able to explain how the decedent's

relationship to the properties allegedly transferred to the partnership was altered.

In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred.  See, e.g., Estate of Stone v. Commissioner, supra; Estate of Harrison v. Commissioner, supra.  The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation.  See Estate of Harper v. Commissioner, T.C. Memo. 2002-121; Estate of Harrison v. Commissioner, supra.  A significant purpose must be an actual motivation, not a theoretical justification.

By contrast, the bona fide sale exception is not applicable where the facts fail to establish that the transaction was motivated by a legitimate and significant nontax purpose.  See Estate of Hillgren v. Commissioner, supra; Estate of Thompson v. Commissioner, supra; Estate of Harper v. Commissioner, supra; see also Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000).  A list of factors that support such a finding includes the taxpayer standing on both sides of the transaction, Estate of Hillgren v. Commissioner, supra; the taxpayer's financial dependence on

distributions from the partnership, <u>Estate of Thompson v. Commissioner</u>, <u>supra</u>; <u>Estate of Harper v. Commissioner</u>, <u>supra</u>; the partners' commingling of partnership funds with their own, <u>Estate of Harper v. Commissioner</u>, <u>supra</u>, and the taxpayer's actual failure to transfer the property to the partnership, <u>Estate of Hillgren v. Commissioner</u>, <u>supra</u>.

The Court of Appeals for the Fifth Circuit recently decided a case in this area, <u>Kimbell v. United States</u>, 371 F.3d 257, 258 (5th Cir. 2004). In <u>Kimbell</u>, the decedent transferred assets including $2.5 million in cash, an active oil and gas business, and royalties to a trust. The trust contributed the property to a family limited partnership and received a 99-percent pro rata partnership interest in return. The other partner was a limited liability company (the LLC) owned by the decedent, her son, and his wife. The LLC contributed $25,500 in exchange for a 1-percent general partnership interest. The oil and gas working assets constituted 11 percent of the partnership's assets. The decedent retained over $450,000 in assets for her personal expenses.

The court separated the bona fide sale exception into two prongs: (1) Whether the transaction qualifies as a bona fide sale; and (2) whether the decedent received adequate and full consideration. The court first examined the adequate and full consideration language and set forth an objective inquiry. <u>Id.</u>

at 262.  The court stated that the proper question in examining the adequate and full consideration prong was whether the sale depleted the gross estate.  Id. (citing Wheeler v. United States, 116 F.3d 749, 759 (5th Cir. 1997)); see Estate of Frothingham v. Commissioner, 60 T.C. 211, 215-216 (1973).

The Court of Appeals disagreed with the District Court's determination that a sale between members of the same family cannot be a bona fide one.  Kimbell v. United States, supra at 267.  A transaction between family members is, however, subjected to heightened scrutiny to ensure that it is not a sham or disguised gift.  Applying its test to the facts, the Court of Appeals held in Kimbell that the pro rata partnership interest the decedent received was adequate and full consideration.  The court also found that the decedent's transfer met the bona fide sale exception because the partnership was in actual possession of the assets transferred, partnership formalities were satisfied, she retained sufficient assets outside of the partnership to meet her personal needs, some of the assets contributed were active business assets, and she had nontax business reasons for creating the partnership.  Id.  The nontax business reasons included, among others, the protection of the taxpayer from personal liability with regard to the oil and gas properties contributed, the pooling of all of the decedent's assets to provide greater financial growth than splitting the

assets up, and the establishment of a centralized management structure. Additionally, the court rejected the Commissioner's argument that the LLC's interest was de minimis since it found no principle in partnership law that required partners to own "a minimum percentage interest in the partnership for the entity to be legitimate". Id. at 268.

Recently, the Court of Appeals for the Third Circuit affirmed Estate of Thompson v. Commissioner, supra, in Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004). Focusing on the adequate and full consideration language, the court stated an inter vivos transfer in exchange for assets of a lesser value should trigger heightened scrutiny into the substance of the transaction. Id. at 381. The Third Circuit found that neither partnership engaged in transactions rising to the level of legitimate business operations that provided the decedent with a substantive nontax benefit. Id. at 379. This determination was supported by the partnerships' allocating income produced by certain assets to the contributing partner, and the testamentary nature of one of the partnership's lending practices. Even though the estate presented evidence that one of the partnerships engaged in a real estate investment, the testamentary nature of the transfer and the subsequent operation of the partnership outweighed any legitimizing effect of that investment. In addition, the Court of Appeals found that the decedent

contributed marketable securities to the partnerships, but the partnerships failed to sell or diversify them. Other than favorable estate tax treatment resulting from this change in form, the court was unable to identify a legitimate and significant nontax reason for the transfer. See id. at 380. The court therefore held that there was no adequate consideration within the meaning of section 2036(a).

The Court of Appeals also concluded that the decedent's transfers to the family limited partnerships did not constitute bona fide sales within the meaning of section 2036(a). The Third Circuit noted that it is important to scrutinize the substance of an intrafamily transaction because "'the family relationship often makes it possible for one to shift tax incidence by surface changes of ownership without disturbing in the least his dominion and control over the subject of the gift or the purposes for which the income from the property is used.'" Id. at 382 (quoting Commissioner v. Culbertson, 337 U.S. 733 (1949)).

C. Decedent's Transfer of Empak Stock to WCB Holdings

Respondent contends that decedent's transfer of Empak stock to WCB Holdings was not a bona fide sale for adequate and full consideration in money or money's worth. The estate's position is that decedent's transfer of Empak stock to WCB Holdings was a bona fide sale for adequate and full consideration. As stated above, a finding to that effect would preclude the application of

section 2036; thus, the Empak stock decedent transferred to WCB Holdings would not be included his gross estate under section 2036(a). Moreover, if section 2036(a) does not apply to decedent's transfer, section 2035(a) cannot apply to the gifts he made of WCB Holdings class A governance units to CH Trust, GC Trust, and QTIP Trust. Essentially, the question is whether decedent's gross estate includes, via the application of section 2036(a), the Empak stock decedent transferred to WCB Holdings.

In order to answer this question, we must separate the true nontax reasons for the entity's formation from those that merely clothe transfer tax savings motives. Legitimate nontax purposes are often inextricably interwoven with testamentary objectives. See, e.g., Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380.

In 1995, decedent, while in good health, met with his advisers, Messrs. Boyle, Bernards, and Eitel, to discuss how Empak could remain successful and competitive. These discussions determined that Empak needed to develop additional means for acquiring capital to remain successful and competitive. Mr. Bernards testified that for Empak to grow, "additional capital other than through bank debt and through [reinvesting its] earnings" was needed. It was believed that positioning Empak for either a public or private offering (a corporate liquidity event) would accomplish this goal. Decedent and his advisers discussed

how to facilitate a corporate liquidity event for Empak.  Mr.
Boyle drafted a memo and a checklist detailing the specific steps
of the plan to position Empak for a corporate liquidity event.

Many of the steps in the checklist were completed.  First,
Empak formed Emplast, and Empak distributed its stock to
decedent.  Second, incentive stock options were established.
Third, decedent and ISA Trust transferred their stock in Empak to
WCB Holdings, and in exchange each received interests in WCB
Holdings proportionate to the number of Empak shares they had
contributed.  Fourth, Empak International merged into Empak.
Decedent was in good health until his sudden death in 1998; never
was his health a reason to accelerate the completion of these
steps.

The positioning and structuring of Empak to facilitate a
corporate liquidity event was also beneficial for decedent and
ISA Trust.  ISA Trust held a single asset, Empak stock.  The
value of the shares held by both decedent and ISA Trust was
maximized by positioning Empak to attract potential investors.
Moreover, the potential market for the Empak shares was
increased.  These facts together support that positioning Empak
for a corporate liquidity event was a legitimate and significant
nontax reason that motivated the Empak shareholders to create WCB
Holdings.

### 1. Bona Fide Sale

Respondent argues that the creation of WCB Holdings did not occur as the result of an arm's-length transaction, and consequently, was not a bona fide sale. In Estate of Harper v. Commissioner, T.C. Memo. 2002-121, relying partially on Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951), we determined that the bona fide sale exception in section 2036(a) is applicable only where there was an arm's-length transaction.

Respondent appears to assert that an arm's-length transaction cannot occur between related parties. An arm's-length transaction has been defined as "A transaction between two unrelated and unaffiliated parties", or alternatively, a transaction "between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." Black's Law Dictionary 1535 (8th ed. 2004). A previous edition of Black's Law Dictionary stated that an arm's-length transaction was the standard for testing whether the resulting terms and conditions of a transaction were the same as if unrelated parties had engaged in the same transaction. See Black's Law Dictionary 100 (5th ed. 1979) (stating that "in testing whether $10,000 is an 'arm's length' price [for the sale of property] it must be ascertained for how much the corporation could have sold the property to a disinterested third party in a bargained transaction"); see also

Dauth v. Commissioner, 42 B.T.A. 1181, 1189 (1940) (stating "The test to determine whether a transaction is a bona fide transaction [for Federal income tax purposes] is described by the term 'arm's length', or, in other words, Was the transaction carried out in the way that the ordinary parties to a business transaction would deal with each other?"). The bona fide sale exception has not been limited to transactions involving unrelated parties as respondent's argument implies. See Estate of Stone v. Commissioner, T.C. Memo. 2003-309.

It is axiomatic that intrafamily transactions are subjected to a higher level of scrutiny, but this heightened scrutiny is not tantamount to an absolute bar. In that connection, we have already concluded that decedent and ISA Trust had mutual legitimate and significant nontax reasons for forming WCB Holdings. In addition, both decedent and ISA Trust received interests in WCB Holdings proportionate to the number of shares transferred. We believe that had this transaction occurred between two unrelated parties the majority interest holder in Empak would have received similar powers to those the decedent received via WCB Holdings's member control agreement. An important purpose for creating WCB Holdings was to position Empak for a corporate liquidity event, and the record does not contain any credible evidence that unrelated parties would not have agreed to the same terms and conditions. Given these facts, we

cannot hold that the terms of the transaction differed from those of two unrelated parties negotiating at arm's length.

Respondent's final argument is that the formation of WCB Holdings was not a bona fide sale because there was not a true pooling of assets. WCB Holdings's purpose was to pool the Bongard family's Empak stock within a single entity, which decedent and ISA Trust satisfied through their respective contributions. WCB Holdings's creation was part of a much grander plan, to attract potential investors or to stimulate a corporate liquidity event to facilitate Empak's growth. Moreover, when WCB Holdings was capitalized, the members' capital accounts were properly credited and maintained, WCB Holdings's funds were not commingled with decedent's, and all distributions during decedent's life were pro rata. The amalgamation of these facts evinces that this transaction resulted in a true pooling of assets.

### 2. Full and Adequate Consideration

The factual circumstances of this case further establish that decedent and ISA Trust each received an interest in WCB Holdings that represented adequate and full consideration reducible to money value. See Estate of Stone v. Commissioner, T.C. Memo. 2003-309; Estate of Higgins v. Commissioner, T.C. Memo. 1991-47; see also secs. 20.2036-1(a), 20.2043-1(a), Estate Tax Regs. Decedent and ISA Trust received interests in WCB

Holdings proportionate to the number of Empak shares each contributed. Although by itself this may not be sufficient evidence to meet the adequate and full consideration requirement, two additional facts do support such a finding. We have determined that the respective assets contributed by the members were properly credited to the respective capital accounts of each contributing member, and distributions from WCB Holdings required a negative adjustment in the distributee member's capital account. Most importantly, we have found the presence of a legitimate and significant nontax business reason for engaging in this transaction.

Respondent nonetheless argues that decedent did not receive adequate and full consideration since decedent contributed 86.31 percent of Empak's outstanding stock without receiving a control premium for his contribution. Decedent did not need to receive a control premium because he retained effective control over Empak after he contributed his Empak stock to WCB Holdings. True, decedent was not the chief manager of WCB Holdings, but the 86.31-percent interest in the class A governance units he received in the exchange provided him with the power to remove the WCB Holdings chief manager and appoint himself as chief manager, to take any action the chief manager himself could take, and to approve any significant action the chief manager could take, including selling more than $10,000 worth of any security

in any 12-month period and the voting of any security held by WCB Holdings. See also Estate of Thompson v. Commissioner, 382 F.3d at 381 (agreeing that the dissipated value resulting from a transfer to a closely held entity does not automatically constitute inadequate consideration for section 2036(a) purposes, but such dissipation triggers heightened scrutiny into the substance of the transaction and whether there was a true business purpose).

### 3. Conclusion

We hold that decedent's transfer of Empak stock to WCB Holdings satisfies the bona fide sale exception of section 2036(a). Therefore, we need not determine whether decedent retained a section 2036(a) or (b) interest in the transferred property. This holding further precludes the application of section 2035(a) to decedent's gifts of WCB Holdings class A membership units to CH Trust, GC Trust, and QTIP Trust as they were outright gifts, not gifts of retained section 2036(a) interests. See Kisling v. Commissioner, 32 F.3d 1222, 1225 (8th Cir. 1994), revg. T.C. Memo. 1993-262; Estate of Jalkut v. Commissioner, 96 T.C. 675, 679 (1991); Estate of Frank v. Commissioner, T.C. Memo. 1995-132.

### D. BFLP

The estate argues that section 2036(a) is not applicable to decedent's transfer of WCB Holdings class B membership units to

BFLP since that transfer was also a bona fide sale for adequate and full consideration.  The estate contends that the creation of BFLP was motivated by nontax reasons.  The BFLP agreement provides that BFLP was established to "acquire, own and sell from time to time stocks (including closely held stocks), bonds, options, mutual funds and other securities."  At trial, Mr. Fullmer testified that BFLP was established to provide another layer of credit protection for decedent.  Additionally, the estate asserts that BFLP facilitated decedent's and Cynthia Bongard's postmarital agreement.  Messrs. Bernards and Fullmer both also testified that BFLP was established, in part, to make gifts.  On December 10, 1997, decedent made a gift of a 7.72-percent ownership interest in BFLP to Cynthia Bongard.  This gift was the sole transfer of a BFLP partnership interest by decedent during his life.  BFLP also never diversified its assets during decedent's life, never had an investment plan, and never functioned as a business enterprise or otherwise engaged in any meaningful economic activity.

### Bona Fide Sale Exception

In determining whether the bona fide sale exception in section 2036(a) applies to an intrafamily transaction, the substance of the transaction is subject to a higher level of scrutiny.  See Estate of Thompson v. Commissioner, supra at 383.

Both parties set forth facts supporting their respective positions regarding decedent's transfer of WCB Holdings class B membership units to BFLP.

In support of its contention that decedent's transfer to BFLP satisfied the bona fide sale exception, the estate asserts that ISA Trust was adequately and independently represented in negotiating the terms of the BFLP transaction. Mr. Boyle explained to Mark Bongard, the other trustee of ISA Trust, the terms and reasons for engaging in the partnership. In addition, after BFLP was formed, partnership formalities were complied with.

Conversely, respondent asserts that BFLP was "simply a paper transaction designed to facilitate the distribution of family wealth both before and after death while leaving decedent's lifetime control of Empak unimpaired."[11] In support of his position, respondent asserts that decedent's and ISA Trust's contributions to BFLP were not a true pooling of assets because decedent's relationship to the contributed assets remained the same before and after the contribution. Following decedent's contribution to BFLP and until his death, BFLP never engaged in any investment transactions or decisions. BFLP had neither an investment plan nor a diversification strategy.

_____

[11]Respondent has not challenged whether BFLP is a partnership that should be recognized for tax purposes under sec. 761(a) or 7701(a)(2), so we do not reach that issue in this case.

Estate tax savings did play an important role in motivating the transfer to BFLP. The record does not support that the nontax reasons for BFLP's existence were significant motivating factors. The formation of WCB Holdings eliminated direct stock ownership in Empak and allowed decedent to make gifts without diversifying the direct ownership of Empak. Messrs. Fullmer and Bernards testified that an impetus for forming BFLP was to continue decedent's gift giving. Decedent, in fact, made numerous gifts after the formation of BFLP, but not of his BFLP interest. All of the gifts decedent made were of WCB Holdings class A membership units, except for the 7.72-percent limited partnership interest he gave to Cynthia Bongard in 1997. At the time of BFLP's formation and at the time of his death, any additional gifts decedent had contemplated were speculative and indefinite at best. There was no immediate or definite plan for such gifts. Such intent is not sufficient to establish that the transfer of membership units to BFLP was motivated by a significant nontax reason.

Decedent and Cynthia Bongard entered into a postmarital agreement on December 10, 1997. For a postmarital agreement to be valid under Minnesota Statutes section 519.11 (West 1990 & Supp. 2004), in effect at the time the agreement was entered into, each spouse needed to have titled in that spouse's name property with a total net value exceeding $1,200,000. Attached

to the postmarital agreement was Cynthia Bongard's financial statement, which included the value of her interest in BFLP and QTIP Trust.  QTIP Trust was funded by decedent's giving it WCB Holdings class A membership units on March 15, 1997.  Decedent's gift of a small portion of his BFLP interest to his wife does not establish that his prior transfer of all of his class B membership units to BFLP had a significant nontax motive. Decedent's gift of the 7.72-percent BFLP interest to Cynthia Bongard does not establish a significant nontax reason for decedent to transfer all 4,621,166 WCB Holdings class B membership units he owned to BFLP.  The motive for the transfer of all of decedent's class B membership units to BFLP was not to fund the postmarital agreement.  Rather, decedent used part of his BFLP interest to fund the postmarital agreement simply because that was where the assets rested when the agreement was completed.  The vast majority of decedent's BFLP interest was never transferred in the almost 2 years before his death.

The estate's credit protection argument is also unpersuasive because WCB Holdings served this function for decedent.  In fact, decedent via letter stated that "by holding a majority of my assets in the limited liability company or the limited partnership, I will be providing a greater amount of protection for those assets from both creditors and lawsuits."  Decedent contributed his Empak stock to WCB Holdings in exchange for WCB

Holdings membership units, which he then contributed to BFLP in exchange for his limited partnership interest. Decedent's initial transfer of his Empak shares to WCB Holdings accorded him the credit protection he sought. Any additional benefit provided by BFLP was not significant to the transfer to BFLP because decedent's class A membership units, with their voting power, remained in WCB Holdings with only the protection provided by that entity.

Moreover, we find unpersuasive the estate's argument that decedent wanted to create BFLP because of the greater flexibility it would provide him as compared to the trusts he had previously created. Decedent in fact established three trusts within days of BFLP's creation. These trusts were funded months after BFLP was created with very large gifts. Clearly, decedent was not adverse to establishing trusts, nor is there evidence that would establish how a limited partnership interest in BFLP provided decedent with greater flexibility than he already possessed by holding WCB Holdings membership units outright.

Additionally, BFLP did not perform a management function for the assets it received. BFLP never engaged in any businesslike transactions, either before or after decedent contributed his WCB Holdings class B membership units to BFLP. Until decedent's death, BFLP's only ownership interest was in WCB Holdings, and 99 percent of that interest was contributed by decedent. Similarly,

BFLP never attempted to invest or diversify its assets. As a practical matter, decedent did not receive any benefit beyond transfer tax savings from placing his WCB Holdings class B membership units in BFLP. In Estate of Harper v. Commissioner, T.C. Memo. 2002-121, we found that the decedent only recycled the value of the property he transferred to the partnership. A recycling of value has occurred if "all decedent did was to change the form in which he held his beneficial interest in the contributed property." Id. The partnership in Estate of Harper, like the partnership here, did not establish a different investment plan with respect to its assets. In this case, decedent recycled the value of his WCB Holdings class B membership units by contributing them to BFLP.

Under these facts, decedent's transfer of WCB Holdings class B membership units to BFLP did not satisfy the bona fide sale exception.

III. Whether Decedent Retained a Section 2036(a) Interest in BFLP

Our determination that the bona fide sale exception does not apply to decedent's transfer to BFLP does not end the inquiry. As pertinent here, section 2036(a) includes in a decedent's gross estate "all property to the extent of any interest therein" of which the decedent has made a transfer wherein he "has retained for his life" either "(1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either

alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom." Section 7701(a)(1) defines "person" to include "an individual, a trust, estate, partnership, association, company or corporation."

A. Section 2036(a)

"An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred." Sec. 20.2036-1(a), Estate Tax Regs. "The existence of formal legal structures which prevent de jure retention of benefits of the transferred property does not preclude an implicit retention of such benefits." Estate of Thompson v. Commissioner, 382 F.3d at 375; Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959). The existence of an implied agreement is a question of fact that can be inferred from the circumstances surrounding a transfer of property and the subsequent use of the transferred property. See Estate of Thompson v. Commissioner, supra at 376; Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000).

The decedent did not need the membership interest in WCB Holdings class B shares to continue his lifestyle. However, decedent retained ownership of more than 91 percent of his BFLP interest and did not make gifts of such interest prior to his death. More importantly, decedent controlled whether BFLP could

transform its sole asset, the class B WCB Holdings membership units, into a liquid asset. Decedent as CEO and sole member of Empak's board of directors determined when Empak redeemed its stock in each of the seven instances of redemptions prior to his death, including the last redemption of about $750,000 worth of Empak stock in 1998 after WCB Holdings was formed. None of the seven redemptions reduced the membership units owned by BFLP. In order for BFLP to be able to diversify or take any steps other than simply holding the class B membership units, decedent would have had to cause the membership units and the underlying Empak stock to be redeemed. He chose not to do this. By not redeeming the WCB membership units held by BFLP, decedent ensured that BFLP would not engage in asset management. Thereby, decedent exercised practical control over BFLP and limited its function to simply holding title to the class B membership units. Whether decedent caused the WCB membership units held by BFLP and the underlying Empak stock to be redeemed or not, his ability to decide whether that event would occur demonstrates the understanding of the parties involved that decedent retained the right to control the units transferred to BFLP.

The estate's argument that the general partner's fiduciary duties prevents a finding of an implied agreement is overcome by the lack of activity following BFLP's formation and BFLP's

failure to perform any meaningful functions as an entity.[12]  We conclude that decedent's transfer to BFLP for a 99-percent ownership interest in the partnership did not alter his control of the WCB Holdings class B membership units transferred to BFLP. See Estate of Thompson v. Commissioner, 382 F.3d at 376-377 (finding "nothing beyond formal title changed in decedent's relationship to his assets" where the practical effect on his relationship to the transferred assets during decedent's life was minimal).

B.  Conclusion

Under the circumstances of this case, an implied agreement existed that allowed decedent to retain the enjoyment of the property held by BFLP.  Therefore, under section 2036(a)(1), decedent's gross estate includes the value of the WCB Holdings class B membership units held by BFLP on decedent's death that is

---

[12]Under Minnesota law, the relationship of partners is fiduciary in character, and each partner owes the other partners the highest degree of integrity, loyalty, and good faith.  Prince v. Sonnesyn, 222 Minn. 528, 535 (1946); Margeson v. Margeson, 376 N.W.2d 269 (Minn. Ct. App. 1985).  In a limited partnership, a general partner can be liable to the limited partners for breach of fiduciary duty.  Minn. Stat. Ann. sec. 322A.33 (West 2004); see also Minn. Stat. Ann. sec. 323.20 (West 1995), repealed by Laws 1997, ch. 174, art. 12, sec. 68, effective Jan. 1, 2002, but replaced by Minn. Stat. Ann. secs. 323A.4-04 and 323A.4-05, effective Jan. 1, 1999 (West 2004).  In addition, the ISA Trust trustees owed fiduciary duties to its beneficiaries.  See Minn. Stat. Ann. sec. 501B.10 (West. Supp. 1990), repealed by Laws 1996, ch. 314, sec. 8, eff. Jan. 1, 1997, replaced by Minn. Stat. Ann. sec. 501B.151, effective Jan. 1, 1997 (West 2002 & Supp. 2004); Minn. Stat. Ann. sec. 501B.60 (West 1990).

proportionate to decedent's 91.28-percent limited partnership interest.  Given this finding, it is unnecessary to determine whether the terms of the BFLP agreement provided decedent explicit rights to control the property.

IV.  Section 2035(a) and Decedent's Gift to Cynthia Bongard

As pertinent here, section 2035(a) provides that a decedent's gross estate includes the value of any property or interest therein if "(1) the decedent made a transfer * * * [of an interest in such property] during the 3-year period ending on the date of the decedent's death, and (2) the value of such property (or an interest therein) would have been included in the decedent's gross estate under section 2036 * * * if such transferred interest * * * had been retained by the decedent on the date of his death".  In this case, decedent transferred a 7.72-percent partnership interest in BFLP to Cynthia Bongard within 3 years of his death.  The issue is whether the value of the partnership interest decedent gave to Cynthia Bongard would have been included in his gross estate had he retained it until his death.

As stated previously, decedent retained a section 2036(a)(1) interest in the WCB Holdings class B membership units he transferred to BFLP because we found the existence of an implied agreement between decedent and ISA Trust.  Decedent's gift of a limited partnership interest to Cynthia Bongard decreased his

ownership interest in BFLP.  Because the partnership interest decedent gave to Cynthia Bongard consisted of a portion of the property that triggered the application of section 2036(a)(1) we find that section 2035(a) is applicable to decedent's transfer of the 7.72-percent limited partnership interest in BFLP.  Thus, decedent's gross estate includes the value of the WCB Holdings class B membership units held by BFLP on decedent's death that is proportionate to the 7.72-percent limited partnership interest.

## V. Discounts Applicable to Decedent's Membership Units in WCB Holdings

The relevant part of section 2031 provides that any property included in a decedent's gross estate is included at its fair market value.  See also sec. 20.2031-1(b), Estate Tax Regs.  The parties stipulated that on the alternate valuation date, May 16, 1999, Empak's stock per share value was $32.24.  This was used as the starting point by the parties to determine the value of the decedent's interests in WCB Holdings and BFLP and was then decreased by stipulated discounts depending upon this Court's determinations regarding the application of section 2036.

We apply the discounts provided by the parties in their stipulation of settled issues with respect to the WCB Holdings membership units.  If section 2036 was not applied to the transfers to WCB Holdings, the parties stipulated to a 13-percent lack of control discount and a 17.5-percent lack of marketability discount.  We are left to apply the stipulation to the value of

decedent's 287,620 WCB Holdings class A membership units and 4,621,166 WCB Holdings class B membership units.

The stipulation provides that the value of decedent's WCB Holdings class A membership units is equal to $32.24 less the stipulated discounts for lack of control and lack of marketability, multiplied by 287,620 (the total number of class A governance and financial membership units decedent owned on the alternate valuation date). As such, the value of decedent's WCB Holdings class A membership units was $6,655,527, as calculated below.

$$[\{\$32.24 - (\$32.24 \times .13)\} - \{(\$32.24 - (\$32.24 \times .13)) \times .175\}] = \$23.14 \times 287,620 = \$6,655,527$$

We read the stipulation to further provide the WCB Holdings class B membership units an additional 5-percent lack-of-voting-rights discount. Given the stipulation and our holdings herein, we find that the value of decedent's WCB Holdings class B membership units on the alternate valuation date was $101,573,229,[13] as calculated below.

$$[\$23.14 - (\$23.14 \times .05)] = \$21.98 \times 4,621,166 = \$101,573,229$$

---

[13]We note that decedent's estate may be entitled to a deduction under sec. 2056 for his inter vivos gift of WCB Holdings class B membership units to Cynthia Bongard that was pulled back into his gross estate under sec. 2035(a).

To reflect the foregoing and give effect to the parties' stipulations,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

Reviewed by the Court.

GERBER, SWIFT, COLVIN, VASQUEZ, THORNTON, HAINES, WHERRY, KROUPA, AND HOLMES, <u>JJ</u>., agree with this majority opinion.

GALE, <u>J</u>., concurs in result only.

LARO, J., concurring in result:  I concur only because I am uncomfortable with the analysis used by the majority in arriving at its result.  That analysis applies a new test that the majority has created to decide whether a transfer to a family limited partnership should be respected for Federal tax purposes. The majority applies its test in lieu of deeply ingrained caselaw that conditions satisfaction of the "bona fide sale for an adequate and full consideration in money or money's worth" exception of section 2036(a) (adequate and full consideration exception) on the transferor's receipt of property equal in value to that of the property transferred by the transferor.  In other words, under that caselaw, the adequate and full consideration exception may apply only where the transferor's receipt of consideration is of a sufficient value to prevent the transfer from depleting the transferor's gross estate.

The majority states its test as follows:  "In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where [1] the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and [2] the transferors received partnership interests proportionate to the value of the property transferred."  Majority op. p. 39.  I disagree with both prongs of this test.  I believe that a transferor satisfies the adequate and full consideration

exception in the context of a transfer to a partnership only when: (1) The record establishes either that (i) in return for the transfer, the transferor received a partnership interest and any other consideration with an aggregate fair market value equal to the fair market value of the transferor's transferred property, or (ii) the transfer was an ordinary commercial transaction (in which case, the transferred property and the consideration received in return are considered to have the same fair market values), and (2) the transfer was made with a business purpose or, in other words, a "useful nontax purpose that is plausible in light of the taxpayer's [transferor's] conduct and useful in light of the taxpayer's economic situation and intentions." ACM Pship. v. Commissioner, T.C. Memo. 1997-115, affd. in part and revd. in part on an issue not relevant herein 157 F.3d 231 (3d Cir. 1998); see also CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16; Salina Pship., L.P. v. Commissioner, T.C. Memo. 2000-352.

    1.  Majority's Conclusion That Transferors Receive Partnership Interests Proportionate to the Value of the Property Transferred

Where the record establishes the existence of a legitimate and significant nontax reason for creating a family limited partnership, the majority concludes that the adequate and full consideration exception is met if the transferors received partnership interests proportionate to the value of the property

transferred.  I disagree with this conclusion.  Section 2036(a)

provides:

> SEC. 2036(a).  General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (<u>except in case of a bona fide sale for an adequate and full consideration in money or money's worth</u>), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--
>
> > (1)  the possession or enjoyment of, or the right to the income from, the property, or
> >
> > (2)  the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.  [Emphasis added.]

Firmly established caselaw holds that the emphasized text, the

adequate and full consideration exception, is satisfied only when

a transferor receives consideration in money or money's worth

equal to the value of the property transferred by the transferor;

i.e., consideration with a value sufficient to prevent the

transfer from depleting the transferor's gross estate.  E.g.,

<u>Estate of Wheeler v. United States</u>, 116 F.3d 749, 761 (5th Cir.

1997) ("unless a transfer that depletes the transferor's estate

is joined with a transfer that augments the estate by a

commensurate (monetary) amount, there is no 'adequate and full

consideration' for the purposes of either the estate or gift

tax"); <u>Estate of D'Ambrosio v. Commissioner</u>, 101 F.3d 309, 312

(3d Cir. 1996) ("consideration should be measured against the value that would have been drawn into the gross estate absent the transfer"), revg. 105 T.C. 252 (1995); United States v. Past, 347 F.2d 7, 12 (9th Cir. 1965) ("The value of what the decedent received under the trust must be measured against the value of the property she transferred to the trust"); United States v. Allen, 293 F.2d 916, 917-918 (10th Cir. 1961) (consideration is "adequate and full" only if it equals or exceeds the value of the property that would otherwise be included in the gross estate absent the transfer); Estate of Frothingham v. Commissioner, 60 T.C. 211, 215-216 (1973) ("unless replaced by property of equal value that could be exposed to inclusion in the decedent's gross estate, the property transferred in a testamentary transaction of the type described in the statute must be included in his gross estate"); see also Commissioner v. Wemyss, 324 U.S. 303, 307 (1945); Estate of Gregory v. Commissioner, 39 T.C. 1012 (1963). The adequacy of consideration for purposes of the adequate and full consideration exception is measured by the value of the property that would have otherwise been included in the transferor's gross estate had the transferor died immediately before the transfer. Estate of D'Ambrosio v. Commissioner, supra at 313. Because transfers of assets under facts similar to those here are typically motivated primarily (if not entirely) by testamentary concerns, section 2036(a) preserves the integrity of

the Federal estate tax system by preventing a depletion of an estate by testamentary-like inter vivos transfers for less than an adequate and full consideration. See <u>United States v. Estate of Grace</u>, 395 U.S. 316 (1969).

Whether the value of consideration received in the form of an interest in a partnership is "adequate and full" within the meaning of section 2036(a) is a valuation issue. For this purpose, I believe that the Court must determine the fair market value of the partnership interest as of the date of the transfer, applying the well-established valuation principles that take into account discounts and/or premiums inhering in that fair market value.[1] The value of the transferred property that would have been included in the transferor's gross estate absent the transfer would have been determined under such a valuation approach. I believe it only natural to conclude that the same approach should apply to determine the value of the consideration that would have replaced the transferred property in the transferor's gross estate had the transferor died immediately

---

[1] The Court need not determine this fair market value, however, if the record establishes that the partnership interest was received in an ordinary commercial transaction. In that case, the values of the transferred and received properties would be considered to be equal. See sec. 25.2512-8, Gift Tax Regs. (transfers "made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth"); see also <u>Harper v. Commissioner</u>, T.C. Memo. 2002-121.

after the transfer.

Moreover, the phrase "adequate and full consideration" has the same meaning in both gift and estate tax cases, Merrill v. Fahs, 324 U.S. 308, 309-311 (1945); Estate of Friedman v. Commissioner, 40 T.C. 714, 718-719 (1963), and this Court has previously applied such a valuation approach in a gift tax case, Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121, arising under section 2512(b) from a transfer of property to a corporation upon its formation.[2] In Estate of Trenchard, the decedents (husband and wife), their daughter, and her three children (the six of whom are collectively referred to as the subscribers) each transferred property to a newly formed corporation in exchange for debt and stock; the decedents' daughter and her three children were the only ones who received common stock. The Court determined that the fair market value of

---

[2] As is true in sec. 2036(a), sec. 2512(b) refers to "value" and "adequate and full consideration in money or money's worth". Specifically, sec. 2512(b) provides:

> SEC. 2512.  VALUATION OF GIFTS.
>
> *    *    *    *    *    *    *
>
> (b) Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

the property that each decedent transferred to the corporation exceeded the fair market value of the stock and debt that they each received in return.  The Court determined the fair market value of that stock noting that a marketability discount inhered in it and that a premium for control also inhered in the fair market value of the decedent/husband's shares.  Consistent with the test applied in this case by the majority, the executrix argued that the excess values were not gifts from each of the decedents to the common shareholders because the decedents' proportionate interests in all of the property transferred to the corporation did not exceed their interests in the total consideration that the subscribers had received in return.  The Court disagreed.  The Court held that the excess values were a gift from the decedents to the common shareholders in that the excess values accrued to the benefit of the common shareholders and increased the value of the interests received by them.

With but a passing reference to language in Estate of Stone v. Commissioner, T.C. Memo. 2003-309, the majority declines to address whether valuation discounts are taken into account for purposes of valuing the consideration received by the decedent from the Bongard Family Limited Partnership (BFLP).  See majority op. pp. 37-38.  Nor does the majority mention that this referenced language was recently rejected by a majority of a panel of the Court of Appeals for the Third Circuit in Estate of

Thompson v. Commissioner, 382 F.3d 367, 386-387 (3d Cir. 2004) (Greenberg, J., concurring and joined by Rosenn, J.),[3] affg. T.C. Memo. 2002-246.  This majority in Thompson (Thompson majority) "reject[ed] Stone on the quoted point [the referenced language] as the Commissioner's position [that the valuation of partnership interests for purposes of section 2036(a) must take into account valuation discounts] in no way reads the [adequate and full consideration] exception out of section 2036(a) and the Tax Court does not explain why it does."  Id.  The Thompson majority went

_____

[3] I have found no law setting the precedential value of a concurring opinion that garners a second vote so as also to be a majority opinion of a Court of Appeals panel.  Cf. Hunt v. Natl. Broadcasting Co., Inc., 872 F.2d 289, 296 (9th Cir. 1989) (recognizing the issue, but stating that it was unnecessary to decide there).  To my mind, such a concurring opinion is entitled to the same respect as any other majority opinion of a panel. See Greene v. Massey, 706 F.2d 548, 550 (5th Cir. 1983) (in response to certification from the U.S. Court of Appeals for the Fifth Circuit, the Supreme Court of Florida answered that a concurring opinion by a Justice of that Court is the law of the case if joined by a majority of that Court's Justices); Detroit v. Mich. Pub. Utils. Commn., 286 N.W. 368, 379 (Mich. 1939) ("It is true that the views of Justice Fellows were expressed in a separate concurring opinion.  Views, however, expressed in separate concurring opinions are the views of the court, when it appears that the majority of the court concurred in such separately expressed views"); Anderson v. Sutton, 293 S.W. 770, 773 (Mo. 1927)("Views expressed in a separate concurring opinion of an individual judge are not the views of the court, unless it appears that the majority of the court concurred in such separately expressed views"); see also State v. Dowe, 352 N.W.2d 660, 662 (Wis. 1984) ("In Outlaw [State v. Outlaw, 321 N.W.2d 145 (Wis. 1982)], the lead opinion represents the majority and is controlling on the issues of the state's burden and the existence of abuse of discretion by that circuit court.  However, the concurring opinions represent the majority on the issue of the test to be applied and therefore control on this point").

on to explain that the Commissioner merely "seeks to apply the exception precisely as written as his position should not be applied in ordinary commercial circumstances even though the decedent may be said to have enjoyed the property until his death." Id. at 387. The majority in this case does not address the Thompson majority's conclusion that valuation discounts may be taken into account for purposes of the adequate and full consideration exception. Nor does the majority in this case attempt to answer the Thompson majority's query as to why applying valuation discounts for such a purpose reads the adequate and full consideration exception out of section 2036(a).

I recognize that the Court of Appeals for the Fifth Circuit in Kimbell v. United States, 371 F.3d 257, 266 (5th Cir. 2004), stated that valuation principles should not be equated with the test of "adequate and full consideration" because business or other financial considerations may enter into a transferor's decision to receive an interest in a limited partnership that may not be immediately sold for 100 cents on the dollar. While I do not disagree that these considerations may cause a transferor to accept such an interest in a partnership, the issue as I see it is whether the inability to realize the 100 cents is attributable to (1) an actual difference in value between the transferred and received properties or (2) the presence of one or more intangible assets the sales price of which is subject to dispute. Under the

caselaw referenced above, the adequate and full consideration
exception does not apply where a difference in value between
transferred and received properties causes a depletion in the
transferor's gross estate.  Nor does <u>Kimbell v. United States</u>,
<u>supra</u>, hold otherwise.  As the <u>Thompson</u> majority observed as to
<u>Kimbell</u>:

> <u>Kimbell</u> does not take into account that to avoid the
> recapture provision of section 2036(a) the property
> transferred must be replaced by property of equal value
> that could be exposed to inclusion in the decedent's
> gross estate * * * on a money or money's worth basis.
> [<u>Estate of Thompson v. Commissioner</u>, <u>supra</u> at 387 n.24
> (Greenberg, <u>J.</u>, concurring and joined by Rosenn, <u>J.</u>);
> citations and quotation marks omitted.]

2.  <u>Majority's Conclusion That the Record Establishes
the Existence of a Legitimate and Significant Nontax Reason
for Creating a Family Limited Partnership</u>

Where the transferors received family limited partnership
interests proportionate to the value of property transferred to
the partnership, the majority concludes that the adequate and
full consideration exception is satisfied if there was a
legitimate and significant nontax reason for creating the
partnership.  I disagree with this conclusion for three reasons.

First, I disagree with the use of the majority's "legitimate
and significant nontax reason" test.  See majority op. p. 39.  I
would apply the longstanding and well-known business purpose test
of <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935).  Indeed, the Court
of Appeals for the Third Circuit used that business purpose test
in <u>Estate of Thompson v. Commissioner</u>, <u>supra</u> at 383, when it

stated:

> A "good faith" transfer to a family limited partnership must provide the transferor some potential for benefit other than the potential estate tax advantages that might result from holding assets in the partnership form.  Even when all the "i's are dotted and t's are crossed," a transaction motivated solely by tax planning and with "no business or corporate purpose ... is nothing more than a contrivance."  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  * * *

The Court of Appeals for the Eighth Circuit, the court to which an appeal of this case would most likely lie, also has regularly used a business purpose/economic substance test in Federal tax matters, e.g., IES Indus., Inc. v. United States, 253 F.3d 350 (8th Cir. 2001); Bergman v. United States, 174 F.3d 928 (8th Cir. 1999), including matters dealing with estate and gift taxes, e.g., Estate of Schuler v. Commissioner, 282 F.3d 575 (8th Cir. 2002), affg. T.C. Memo. 2000-392; Sather v. Commissioner, 251 F.3d 1168 (8th Cir. 2001), affg. in part and revg. in part on the applicability of accuracy-related penalties T.C. Memo. 1999-309.

Second, the words "legitimate" and "significant" are ambiguous and subject to various interpretations.  For example, as I read the meaning of the adjective "legitimate" in Merriam-Webster's Collegiate Dictionary 665 (10th ed. 1999), I am unsure which of those meanings the majority intends to give to that word.  The only possible meanings are:  "2 : being exactly as purposed: neither spurious nor false"; "3 a : accordant with law or with established legal forms and requirements"; and "4 :

conforming to recognized principles or accepted rules and standards". An uncertainty in the meaning of the words "legitimate" and "significant" may result in applications not intended by the majority.

Third, the majority requires only that the creation of the partnership be supported by a legitimate and significant nontax reason. Under the majority's analysis, therefore, the adequate and full consideration exception would seem to be satisfied as to all property transferred to a partnership as long as the record establishes the requisite legitimate and significant nontax reason and that the transferors received partnership interests proportionate to the value of the transferred property. Where, as here, the legitimacy of a partnership is not at issue,[4] I do not believe that the Court's analysis should rest solely on the transferor's reason for forming the partnership; the Court's analysis should also include an inquiry as to the business purpose for the transfers to the partnership. In fact, as I read the relevant text underlying the adequate and full consideration exception, that text speaks only to a "sale" of property and makes no specific statement as to the purchaser of that property.

MARVEL, J., agrees with this concurring in result opinion.

---

[4] The majority states that it is not deciding whether BFLP is a partnership that should be recognized for Federal tax purposes. Majority op. p. 52 n.11.

HALPERN, J., concurring in part and dissenting in part.[1]

I.  Introduction

I write separately to express my disagreement with the majority's interpretation of the bona fide sale exception found in section 2036(a).[2]

The majority states:

> In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where the record establishes [1] the existence of a legitimate and significant nontax reason for creating the family limited partnership, and [2] the transferors received partnership interests proportionate to the value of the property transferred. [Majority op. p. 39]

I believe that the majority has strayed from the traditional interpretation of the bona fide sale exception by incorporating into the exception an inappropriate motive test ("a legitimate and significant nontax reason"), and by concluding that a partnership interest "proportionate" to the value of the property transferred constitutes adequate and full consideration in money or money's worth.

---

[1]  I concur with the majority insofar as it decides that the value of the shares of Empak, Inc., transferred by decedent to WCB Holdings, LLC (WCB Holdings), is not included in the value of the gross estate (although I do not agree with the reasoning the majority uses to reach that result).  I disagree with the majority that the value of the WCB Holdings membership units transferred to the Bongard Family Limited Partnership is included in that value.

[2]  I have not joined Judge Laro's separate opinion because, in important particulars, I disagree with his stated views.

II.  Bona Fide Sale Exception

   A.  Introduction

   Section 2036 is entitled "Transfers with retained life estate", and subsection (a) thereof provides the following general rule:

   SEC. 2036(a).  General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

      (1) the possession or enjoyment of, or the right to the income from, the property, or

      (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.  [Emphasis added.]

Thus, even if a transferor of property retains lifetime possession, enjoyment, income, or control of the property, the value of the property will not show up in her gross estate if the transfer was a bona fide sale within the meaning of the underscored language (the bona fide sale exception).

   With respect to at least that portion of the bona fide sale exception that requires "adequate and full consideration in money or money's worth" (for short, sometimes, full consideration), the identical language appears in section 2512(b), which provides that a gift occurs when property is transferred for insufficient

consideration.[3] That language has the same meaning in the respective contexts of the gift tax and the estate tax. <u>Estate of Friedman v. Commissioner</u>, 40 T.C. 714, 718-719 (1963) ("[I]f the transfer under scrutiny is considered as made for an adequate and full consideration for gift tax purposes, it likewise is to be considered for estate tax purposes."); see also <u>Merrill v. Fahs</u>, 324 U.S. 308, 311 (1945) (the gift and estate taxes are in pari materia and must be construed together). The gift-on-account-of-insufficient-consideration rule of section 2512(b) is construed in section 25.2512-8, Gift Tax Regs., which, in pertinent part, provides:

> SEC. 25.2512-8 Transfers for insufficient consideration.
>
> Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. However, a sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative

---

[3] Sec. 2512(b) provides:

> SEC. 2512(b). Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift, and shall be included in computing the amount of gifts made during the calendar year.

intent), will be considered as made for an adequate and full consideration in money or money's worth. * * *

Under that regulation, transfers of property reached by the gift tax include transfers where (and to the extent) the value of the property transferred by the donor exceeds the value in money or money's worth (cash value) of the consideration given in exchange therefor.[4]  A presumption of full consideration arises, however, in the case of a transfer of property made in the ordinary course of business; i.e., a transfer that is "bona fide, at arm's length, and free from any donative intent".  Id.  One consequence of satisfying the ordinary-course-of-business test is that the inquiry as to full consideration is avoided (and the actual fair market value of the consideration given for the transferred property is irrelevant).

B.  Approach of the Majority

On pages 19-20 of its report, the majority makes the following finding:

> On December 28, 1996, decedent signed a letter that was written by Mr. Fullmer and addressed to

---

[4]  As we have recently said:  "The meaning of the phrase 'in money or money's worth', when it follows 'adequate and full consideration', has been interpreted to confine the scope of 'consideration' to money or its equivalent; i.e., to exclude a mere promise or agreement as consideration."  Abeid v. Commissioner, 122 T.C. 404, 409 n.7 (2004); see also sec. 25.2512-8, Gift Tax Regs. ("A consideration not reducible to a value in money or money's worth, as love and affection, promise of marriage, etc., is to be wholly disregarded [in determining adequate and full consideration], and the entire value of the property transferred constitutes the amount of the gift.").

decedent's children.  The letter expressed some reasons for forming WCB Holdings and BFLP.  The letter explained that the entities provided, among other things, a method for giving assets to decedent's family members without deterring them from working hard and becoming educated, protection of his estate from frivolous lawsuits and creditors, greater flexibility than trusts, a means to limit expenses if any lawsuits should arise, tutelage with respect to managing the family's assets, and tax benefits with respect to transfer taxes.

Mr. Fullmer was decedent's estate planning attorney, see majority op. p. 12, and among the reasons set forth by decedent for forming WCB Holdings, LLC (WCB Holdings) and the Bongard Family Limited Partnership (BFLP) are family gifts and the achievement of transfer tax benefits (read, "savings").  The transfer tax savings result from the loss in value (giving rise to a valuation discount) that petitioner claims accompanied decedent's sequential packaging of (1) his Empak, Inc. (Empak), stock in WCB Holdings and (2) his WCH Holdings Class B units in BFLP.  The lost value, of course, was not beyond reclamation:  It would be restored if BFLP and WCB Holdings were unpacked, which seems likely once decedent's interests in the two entities passed through decedent's estate and the Empak shares became more liquid.  The transfer tax savings that decedent admitted were his objective thus serve only to increase by the amount of those savings (less, of course, transaction costs, such as lawyer's fees) the size of decedent's estate passing into the hands of his heirs.  The achievement of transfer tax savings evidences

donative intent because such savings translate almost dollar for dollar into the enhancement of the net value that decedent could gratuitously transfer to family members.  Consequently, the transfers to WCB Holdings and BFLP (together, the transfers) were not free of donative intent.  That being the case, the transfers were not, in the terms of section 25.2512-8, Gift Tax Regs., made in the ordinary course of business, and there is no presumption that either the WCB Holdings membership units received by decedent for his Empak shares or the 99-percent limited partnership interest in BFLP received by decedent for his WCB class B membership units constituted full consideration for those transfers.  Id.

Therefore, to establish that the transfers were for full consideration, petitioner must, for each transfer, establish that the value of the property transferred by decedent did not exceed the cash value of the property received by him.  Id.  By the explicit terms of section 25.2512-8, Gift Tax Regs., the resulting inquiry is limited to an economic calculus, and there is no room for any inquiry as to the transferor's (decedent's) state of mind.  Yet the majority makes his state of mind critical:

> Decedent * * * received [an interest] in WCB Holdings proportionate to the number of Empak shares * * * [he] contributed.  Although by itself this may not be sufficient evidence to meet the adequate and full consideration requirement, two additional facts do support such a finding.  We have determined that the

> respective assets contributed by the members were properly credited to the respective capital accounts of each contributing member, and distributions from WCB Holdings required a negative adjustment in the distributee member's capital account. <u>Most importantly, we have found the presence of a legitimate and significant nontax business reason for engaging in this transaction</u>. [Majority op. pp. 48-49; emphasis added.]

Certainly, decedent's state of mind (i.e., his intent) is important in determining whether the ordinary-course-of-business exception applies (was the transfer "free of any donative intent"), but once it is determined that the transfer in question was not made in the ordinary course of business, intent is no longer relevant to the determination of whether the transfer was for full consideration.

I also disagree with the implication of the majority opinion that, in the context of a transfer to an entity (here, transfers to both a limited liability company and a family limited partnership), the full consideration requirement can be met by a showing that the transferor received an entity interest (e.g., a limited partnership interest) proportionate to the value of the property contributed to the entity. While an inquiry as to proportionality may have some bearing on whether the transfer was in the ordinary course of business, within the meaning of section 25.2512-8, Gift Tax Regs. (e.g., was at arm's length[5]), I fail to

---

[5] I do not wish to suggest that proportionality (as discussed in the text) is determinative that a transaction is at
(continued...)

see how proportionality aids the inquiry as to whether the value of the property transferred exceeded the cash value of the consideration received in exchange. See id. Here, because of the presence of donative intent, the transfers cannot be considered in the ordinary course of business, as that term is used in section 25.2512-8, Gift Tax Regs., and proportionality is irrelevant.

Finally, as I read the majority's approach to the bona fide sale exception, the majority has added to the exception the requirement that the taxpayer show that the decedent's transfer to the entity was motivated "by a legitimate and significant nontax purpose." Majority op. p. 39.[6] If, indeed, that is the majority's approach, then even if an objective analysis indicates that the transferor received full consideration, the bona fide sale exception presumably would not be satisfied if a subjective analysis reveals that the transaction did not have a legitimate and significant nontax purpose. According to the majority, indicators of the lack of such purpose include (1) that the

---

[5](...continued)
arm's length. Unless a gift motive is conceded or some secret knowledge is presumed, I am not persuaded that a rational person dealing at arm's length would ever knowingly exchange assets worth $300 for an interest in an entity worth $200, with no right to control the entity or compel a distribution of her share of the entity's assets.

[6] As I see it, the addition of that separate test is not necessary here, since petitioner has not otherwise shown that the transfers satisfy the bona fide sale exception.

transferor stood on both sides of the transaction, (2) commingling of the transferor's and the transferee's funds, and (3) the failure of the transferor actually to make a transfer. Majority op. p. 39. Certainly, the "bona fide sale" portion of the bona fide sale exception would exclude transfers that were shams or based on illusory consideration. See, e.g., Wheeler v. United States, 116 F.3d 749, 764 (5th Cir. 1997). Beyond that, however, so long as an objective analysis demonstrates that, in exchange for the transferred property, the transferor received consideration with at least an equal cash value, no depletion of the transferor's wealth has occurred, and it is difficult to see any policy reason to bring back into the gross estate the value of the property transferred. As we reasoned in Estate of Frothingham v. Commissioner, 60 T.C. 211, 215-216 (1973) (emphasis added):

> [W]here the transferred property is replaced by other property of equal value received in exchange, there is no reason to impose an estate tax in respect of the transferred property, for it is reasonable to assume that the property acquired in exchange will find its way into the decedent's gross estate at his death unless consumed or otherwise disposed of in a nontestamentary transaction in much the same manner as would the transferred property itself had the transfer not taken place.  * * *
>
> In short, unless replaced by property of equal value that could be exposed to inclusion in the decedent's gross estate, the property transferred in a testamentary transaction of the type described in the statute must be included in his gross estate.  * * *

See also <u>Kimbell v. United States</u>, 371 F.3d 257, 262 (5th Cir. 2004) (citing <u>Wheeler v. United States</u>, <u>supra</u>); <u>Magnin v. Commissioner</u>, 184 F.3d 1074, 1079 (9th Cir. 1999), revg. T.C. Memo. 1996-25; <u>Estate of D'Ambrosio v. Commissioner</u>, 101 F.3d 309, 312 (3d Cir. 1996), revg. and remanding 105 T.C. 252 (1995).[7]

---

[7] Two commentators on the family limited partnership scene add the following with respect to meaning of the "bona fide sale" portion of the bona fide sale exception:

Treas. reg. section 20.2036-1 indicates that the exception applies where there is "adequate and full consideration." It does not mention any requirement that the sale also be a bona fide one. It does, however, cross-reference Treas. reg. section 20.2043-1(a), which does appear to contemplate the need to satisfy two conditions for the exception to apply: that the sale be a bona fide one and that the consideration be adequate. Nonetheless, the latter regulation is not inconsistent with the traditional (<u>Wheeler's</u> [<u>Wheeler v. United States</u>, 116 F.3d 749, 764 (5th Cir. 1997)]) understanding of the exception. Its use of the phrase "bona fide" is obviously designed to do nothing more than make certain that the consideration was actually supplied and not an illusory one. Indeed, the last sentence of the provision confirms this reading. It provides that, if the value at the time of death of the transferred asset to be included under section 2036 (or similar section) exceeds the consideration received by the decedent, only the excess is included in the gross estate. The failure to require that the sale be a bona fide one to qualify for treatment under this last sentence makes it clear that it was intended to embrace the traditional understanding of the exception.

Gans & Blattmachr, "<u>Strangi</u>: A Critical Analysis and Planning Suggestions", 100 Tax Notes 1153, 1162, n.78 (Sept. 1, 2003).

C.  Conclusion

I would approach the question of whether the value of property transferred by a decedent is included in the gross estate on account of section 2036 by, first, determining whether the decedent retained lifetime possession, enjoyment, income, or control of transferred property.  Only after answering that question in the affirmative would I proceed to determine whether the bona fide sale exception applies to the transfer.  In determining whether the bona fide sale exception applies, I would first determine whether the transfer was made in the ordinary course of business, as that term is used in section 25.2512-8, Gift Tax Regs.  If not, I would determine whether the transfer was made for full value (i.e., whether the value of the transferred property at most equaled the cash value of the consideration received therefor).  If not, then I would find that the value of the transferred property was included in the value of the gross estate pursuant to section 2036.  Motive would only play the limited role I have outlined above (i.e., determining donative intent for purposes of the ordinary-course-of-business test).

III.  Gift on Formation

The foregoing analysis suggests that, in forming a family-owned entity (e.g., a family limited partnership), one or more of the transfers to the entity might be deemed gifts, within the

meaning of section 2512, because the transfers were for insufficient consideration, within the meaning of section 25.2512-8, Gift Tax Regs.  I believe that a transfer to a family-owned entity may constitute a taxable gift, even if the size of the entity interest received by each transferor is deemed proportional to the value of the property contributed by that transferor.[8]

Consider the following hypothetical situation:[9]

> Father, son, and daughter (F, S, and D) join in the formation of a family limited partnership (FLP), father making the bulk of the total contribution and receiving a limited partnership interest, S and D making smaller contributions and receiving general and

---

[8] Judge Ruwe suggests a gift-on-formation analysis in his dissenting opinion in Estate of Strangi v. Commissioner, 115 T.C. 478, 496 (Ruwe, J., dissenting), affd. in part and revd. in part 293 F.3d 279 (5th Cir. 2002).  The Estate of Strangi majority opinion, which I joined, rejects that possibility, at least on the facts presented, on the grounds that Mr. Strangi (the decedent) did not give up control of the assets he contributed to the family limited partnership (for a 99 percent limited partnership interest) and his contribution was allocated to his capital account:  "Realistically, in this case, the disparity between the value of the assets in the hands of decedent and the alleged value of his partnership interest reflects on the credibility of the claimed discount applicable to the partnership interest.  It does not reflect a taxable gift."  Id. at 490.  Similarly, in Estate of Jones v. Commissioner, 116 T.C. 121, 128 (2001), we said:  "All of the contributions of property were properly reflected in the capital accounts of decedent, and the value of the other partners' interests was not enhanced by the contributions of decedent.  Therefore, the contributions do not reflect taxable gifts."

[9] The hypothetical and some of the following analysis are suggested by Professor Leo L. Schmolka; Schmolka, "FLPs and GRATs:  What to do?", 86 Tax Notes 1473 (Special Supplement, Mar. 13, 2000).

limited interests.  Each transferor receives a percentage interest in profits, losses, and capital that is strictly proportionate to the value that each contributes (in relation to the total value contributed).  Based on claims of lack of marketability, loss of control, and other value diminishing factors, each interest is accorded some loss of value (in comparison to the value of the property exchanged therefore).  F's will and other testamentary-type documents are executed contemporaneously with the partnership agreement.  They disclose that F's interest in FLP ultimately will pass to S, D, and their children.

Does any of the transferors make a gift on account of his or her contribution to the partnership for an interest of lesser value?  Most likely, S and D do not.  The reason is that, in pertinent part, section 25.2512-8, Gift Tax Regs., provides: "[A] sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth."  From S's and D's viewpoints, the transfers to FLP are made in the ordinary course of business, at least as that term is used in section 25.2512-8, Gift Tax Regs. See Rosenthal v. Commissioner, 205 F.2d 505, 509 (2d Cir. 1953) ("even a family transaction may for gift tax purposes be treated as one 'in the ordinary course of business' as defined in * * * [the predecessor to sec. 25.2512-8, Estate Tax Regs.] if each of the parenthetical criteria is fully met"), revg. and remanding 17 T.C. 1047 (1951).  For S and D, the transfers are motivated

strictly by self-interest and are free from donative intent. They have agreed to form a partnership that they believe will serve as a vehicle for the delivery of F's property to them and their children through a process whereby the transfer tax cost of the delivery will be substantially reduced through various valuation discounts. They agree to suffer a temporary loss of independence and control (and perhaps some loss of fair market value) in order to facilitate the reduction of transfer tax, the burden of which ultimately would fall on them. For them, the transfers are motivated by an acquisitive motive, not a donative motive. They make no gifts because they are deemed to have received full value under the ordinary-course-of-business test found in section 25.2512-8, Gift Tax Regs.

So long as it can be shown that F's contribution was not free of donative intent, the result is different for F. F's purpose (not necessarily his sole purpose, but an important one) is to pass his property to his family with a reduction in transfer tax cost that translates dollar for dollar into an enhancement of the net value that the family will receive. F cannot, therefore, pass the ordinary-course-of-business test in section 25.2512-8, Gift Tax Regs., and, because of the valuation discounts claimed, cannot show full consideration. F, therefore, has made gifts within the meaning of section 2512 and section 25.2512-8, Gift Tax Regs. The measure of the gifts is not the

transfer tax reduction but is the inadequacy of the cash value of the limited partnership interest that F received in consideration for his contribution to FLP. See sec. 25.2512-8, Gift Tax Regs. It is precisely that debasement in value that F sought to achieve as his means of generating the transfer tax saving, and it is appropriate that that be the measure of his gift.

The fact that S, D, and their children may not realize the measure of F's gift (the difference between the inside and outside value of F's interest in FLP) until, by bequests, they receive his interest is not an impediment to concluding that F made a gift. Section 25.2511-2(a), Gift Tax Regs., provides:

> Sec. 25.2511-2 Cessation of donor's dominion and control.
>
> (a) The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable.

In Commissioner v. Wemyss, 324 U.S. 303, 307 (1945), the Supreme Court said: "The section taxing as gifts transfers that are not made for 'adequate and full (money) consideration' aims to reach those transfers which are withdrawn from the donor's estate." The value discounts obtained by F on the transfer to FLP withdrew from his estate amounts that will (and are intended to) reappear

in the hands of his heirs.  Taxation of those amounts under section 2512 is appropriate.

CHIECHI, J., concurring in part[1] and dissenting in part: The majority opinion acknowledges that section 2036(a)(1) will not apply unless: (1) Decedent made a transfer; (2) such transfer was not a bona fide sale for an adequate and full consideration in money or money's worth; and (3) under such transfer decedent retained for his life the possession or enjoyment of, or the right to the income from, the property transferred. The majority opinion holds that decedent's transfer to the Bongard Family Limited Partnership (BFLP) of his WCB Holdings class B membership units was a transfer which was not a bona fide sale for an adequate and full consideration in money or money's worth and under which decedent retained for his life the enjoyment of such units.[2] Consequently, according to the majority opinion, section

---

[1]I concur in the holdings of the majority opinion that decedent made a transfer to WCB Holdings of his Empak stock that was a bona fide sale for an adequate and full consideration in money or money's worth within the meaning of sec. 2036(a) and that consequently sec. 2036(a) does not apply with respect to that transfer. I also concur in the holdings of the majority opinion that, as a result of the foregoing holdings under sec. 2036(a), sec. 2035(a) does not apply with respect to decedent's respective gifts of certain class A membership units in WCB Holdings to the Wayne C. Bongard Children's Trust (Children's Trust), the Wayne C. Bongard Grandchildren's Trust (Grandchildren's Trust), and the Cynthia F. Bongard Qualified Terminal Interest Property Trust (QTIP Trust).

[2]The majority opinion does not hold that decedent retained for his life the possession of, or the right to the income from, the WCB Holdings class B membership units that he transferred to BFLP. Thus, the focus herein is on whether decedent retained for his life the enjoyment of such units within the meaning of sec. 2036(a)(1).

2036(a)(1) requires decedent's gross estate to include the value of such units owned on the date of decedent's death by BFLP that is proportionate to the 91.28-percent BFLP limited partnership interest owned on that date by decedent.[3]  I dissent.[4]  The majority opinion's holding that decedent's transfer to BFLP of his WCB Holdings class B membership units is subject to section 2036(a)(1), which respondent does not even advocate,[5] is rejected by the statute and by United States v. Byrum, 408 U.S. 125

---

[3]Because the majority opinion holds that decedent's transfer to BFLP of his WCB Holdings class B membership units satisfies sec. 2036(a)(1), the majority opinion indicates that it need not address whether such transfer satisfies sec. 2036(a)(2), on which respondent relies.  See infra note 5.

[4]I also dissent from the majority opinion's holding that sec. 2035(a) requires decedent's gross estate to include the value as of the date of decedent's death of the WCB Holdings class B membership units owned on that date by BFLP that is proportionate to the 7.72-percent BFLP limited partnership interest owned on that date by his wife Cynthia Bongard, which she received from decedent as a gift on Dec. 10, 1997, less than a year before he died.  That erroneous holding flows from the majority opinion's erroneous holding under sec. 2036(a)(1).

[5]Respondent relies only on sec. 2036(a)(2), and not on sec. 2036(a)(1), with respect to decedent's transfer to BFLP of his WCB Holdings class B membership units.  Respondent argues with respect to that transfer that, under the partnership agreement governing BFLP, decedent had the right, in conjunction with the Wayne C. Bongard Irrevocable Stock Accumulation Trust (ISA Trust), the general partner of BFLP, to liquidate BFLP and to amend that agreement.  Consequently, according to respondent, decedent retained the right under sec. 2036(a)(2), either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property that he transferred to BFLP or the income therefrom, and sec. 2036(a)(2) requires decedent's gross estate to include the value of certain WCB Holdings class B membership units owned by BFLP on the date of decedent's death. See supra note 3.

(1972), which the majority opinion does not even cite.

At the core of the majority opinion's holdings under section 2036(a)(1) are its conclusions (1) that "The record does not support that the nontax reasons for BFLP's existence were significant motivating factors", majority op. p. 53, and (2) that decedent had the ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP.

I have serious reservations about the propriety of the majority opinion's conclusion that "The record does not support that the nontax reasons for BFLP's existence were significant motivating factors." Majority op. p. 53. However, for purposes of my dissent, I shall proceed on the assumption that that conclusion is proper.[6] Nonetheless, even if, as the majority opinion concludes, the record does not show that "the nontax reasons for BFLP's existence were significant motivating factors", majority op. p. 53, neither section 2036(a)(1) nor the caselaw under that section supports the majority opinion's inference that the absence of any significant nontax reason for the formation of BFLP, standing alone, establishes that decedent

---

[6]Since I shall proceed herein on that assumption, I shall not address the majority opinion's holding that decedent made a transfer to BFLP of his WCB Holdings class B membership units that was not a bona fide sale for an adequate and full consideration in money or money's worth within the meaning of sec. 2036(a).

retained for his life the enjoyment of the WCB Holdings class B membership units that he transferred to BFLP within the meaning of section 2036(a)(1).[7]

I have serious disagreements with the majority opinion's conclusions that decedent had the ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP. I shall discuss those disagreements below.

With the foregoing in mind, I shall now address the majority opinion's holding under section 2036(a)(1) that "an implied agreement existed that allowed decedent to retain the enjoyment of the property held by BFLP". Majority op. p. 59. In support of that holding, the majority opinion constructs the following

---

[7]The absence of a nontax reason for the creation of an entity, standing alone, might permit disregarding that entity for Federal tax purposes under, for example, a sham analysis. However, the majority opinion does not rely on a sham analysis, or any other analysis, that would result in disregarding BFLP for Federal tax purposes. See, e.g., secs. 761(a), 7701(a)(2); cf. Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943). That is because, according to the majority opinion, "Respondent has not challenged whether BFLP is a partnership that should be recognized for tax purposes". Majority op. p. 52 note 11. As discussed supra note 5, respondent does not argue that sec. 2036(a)(1) applies to decedent's transfer to BFLP of his WCB Holdings class B membership units; respondent argues only that sec. 2036(a)(2) applies to that transfer. Nonetheless, the majority opinion applies sec. 2036(a)(1) in reaching its holdings with respect to the transfer at issue to BFLP. In reaching those holdings, not only does the majority opinion rely on a section of the Internal Revenue Code on which respondent does not rely, it constructs a rationale under that section which respondent does not advance and to which the Estate of Wayne C. Bongard (estate) did not have the opportunity to respond.

rationale (majority opinion's rationale):

The decedent did not need the membership interest in WCB Holdings class B shares to continue his lifestyle. However, decedent retained ownership of over 91 percent of his BFLP interest and did not make gifts of such interest prior to his death. More importantly, decedent controlled whether BFLP could transform its sole asset, the class B WCB Holdings membership units, into a liquid asset. Decedent as CEO and sole member of Empak's board of directors determined when Empak redeemed its stock in each of the seven instances of redemptions prior to his death, including the last redemption of about $750,000 worth of Empak stock in 1998 after WCB Holdings was formed. None of the seven redemptions reduced the membership units owned by BFLP. In order for BFLP to be able to diversify or take any steps other than simply holding the class B membership units, decedent would have had to cause the membership units and the underlying Empak stock to be redeemed. He chose not to do this. By not redeeming the WCB membership units held by BFLP, decedent insured that BFLP would not engage in asset management. Thereby, decedent exercised practical control over BFLP and limited its function to simply holding title to the class B membership units. Whether decedent caused the WCB membership units held by BFLP and the underlying Empak stock to be redeemed or not, his ability to decide if that event would occur demonstrates the understanding of the parties involved that decedent retained the right to control the units transferred to BFLP.

The estate's argument that the general partner's fiduciary duties prevents a finding of an implied agreement is overcome by the lack of activity following BFLP's formation and BFLP's failure to perform any meaningful functions as an entity. We conclude that decedent's transfer to BFLP for a 99-percent ownership interest in the partnership did not alter his control of the WCB Holdings class B membership units transferred to BFLP. See Estate of Thompson v. Commissioner, 382 F.3d 367, 376-377 (finding "nothing beyond formal title changed in decedent's relationship to his assets" where the practical effect on his relationship to the transferred assets during decedent's life was minimal).

Majority op. pp. 57-59; fn. ref. omitted.

The majority opinion's rationale is factually, logically, and legally flawed.[8]

The majority opinion's rationale is factually flawed for various reasons. One reason is that it concludes that decedent could have caused WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP. That conclusion is not supported by, and is contrary to, the following findings of fact of the majority opinion regarding the circumstances under which the chief manager of WCB Holdings (chief manager), who was decedent's son Mark Bongard, was required to obtain the approval of a majority of the WCB Holdings class A governance units before he

---

[8]The majority opinion's reliance on Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004), affg. T.C. Memo. 2002-246, is misplaced, as is its reliance on certain other cases, principally Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, and Estate of Harper v. Commissioner, T.C. Memo. 2002-121, in support of its holdings under sec. 2036(a)(1). Each of those cases found the existence of an agreement under which the decedent involved retained for life the possession or enjoyment of, or the right to the income from, the property that such decedent transferred within the meaning of sec. 2036(a)(1). Each of those cases is materially distinguishable from, and is not controlling in, the instant case. For example, unlike cases cited by the majority opinion, decedent here did not transfer to BFLP assets needed to maintain his lifestyle; in the instant case, decedent had millions of dollars of assets that remained outside of BFLP (and outside of WCB Holdings) and that were more than adequate to maintain decedent's lifestyle during his lifetime. In addition, in the instant case, during decedent's lifetime there were no distributions to or on behalf of decedent from BFLP and no commingling of BFLP's assets with decedent's assets, as was done in cases on which the majority opinion relies.

could take certain actions on behalf of WCB Holdings:

> the chief manager needed the approval of the members
> representing the majority of the class A governance
> units before he could issue additional membership
> units, lend, borrow, or commit WCB Holdings's funds in
> excess of $25,000, authorize capital expenditures in
> excess of $10,000, sell any of WCB Holdings's assets,
> including its Empak stock, worth over $10,000 in any
> twelve month period, or vote any securities, including
> its Empak stock, owned by WCB Holdings.

Majority op. p. 14; emphasis added.

After decedent funded, by gift, on March 15, 1997, the Children's Trust, the Grandchildren's Trust, and the QTIP Trust, each with certain class A governance units and certain class A financial units in WCB Holdings, decedent no longer owned a majority of the class A governance units in WCB Holdings, the only voting units in WCB Holdings. Thus, decedent could not have approved, and certainly could not have required, that the chief manager commit any of WCB Holdings's funds in excess of $25,000 for the purpose of redeeming the WCB Holdings class B membership interests owned by BFLP. In addition, decedent could not have approved, and certainly could not have required, that the chief manager sell to Empak, through a redemption by Empak, Empak stock owned by WCB Holdings worth over $10,000 in any 12-month period.

Another factual flaw in the majority opinion's rationale relates to the conclusion that decedent had the ability to cause Empak to redeem the Empak stock owned by WCB Holdings. That conclusion disregards not only the implications of the majority

opinion's finding that decedent and ISA Trust transferred their respective shares of Empak stock to WCB Holdings in order to position Empak for a liquidity event[9] but also decedent's fiduciary duties as Empak's CEO and the sole member of its board of directors. Depleting Empak's assets by causing Empak to redeem the Empak stock owned by WCB Holdings in order to be able to diversify BFLP's assets through a redemption by WCB Holdings of the WCB Holdings class B membership units owned by BFLP would not have been consistent with the objective of positioning Empak for a liquidity event. Indeed, given that objective, it would have been, at best, bad business judgment on the part of decedent and a misconception by him of what was involved in positioning Empak for a liquidity event if he had decided to cause Empak to redeem the Empak stock owned by WCB Holdings in order to effect a diversification of BFLP's assets. Moreover, irrespective of the objective to position Empak for a liquidity event, any decision by decedent to deplete Empak's assets by causing Empak to redeem the Empak stock owned by WCB Holdings in order to effect such a diversification would have been, at worst, a breach by decedent of his fiduciary duties as Empak's CEO and the sole member of its board of directors. Any such decision by decedent might have

---

[9]That finding was critical to the majority opinion's holding that decedent's transfer to WCB Holdings of his Empak stock was a bona fide sale for an adequate and full consideration in money or money's worth within the meaning of sec. 2036(a).

been actionable by the stockholders of Empak, which, as of March

7, 1997, were:  (1) WCB Holdings, a 90-percent stockholder whose

class A governance unitholders, other than decedent,[10] owned in

the aggregate on and after March 15, 1997, a majority of the

voting class A governance membership units in WCB Holdings; (2)

Marubeni Corp. (MC), a 6-percent stockholder and a Japanese

trading entity which had more than 700 subsidiaries and whose

stock was listed on various international stock exchanges; and

(3) Marubeni America Corp., a 4-percent stockholder and the U.S.

sales and marketing subsidiary of MC.  Cf. United States v.

Byrum, 408 U.S. at 137-143.  Thus, any ability of decedent to

cause Empak to redeem the Empak stock owned by WCB Holdings was

not unconstrained.  Instead, any such ability was subject to the

fiduciary duties imposed upon decedent as Empak's CEO and the

sole member of its board of directors and to business and

economic realities and variables over which he had little or no

control and which he could ignore, but only at his peril.  Cf.

id.

The majority opinion's rationale contains other factual

flaws.  According to that rationale,

decedent controlled whether BFLP could transform its
sole asset, the class B WCB Holdings membership units,

---

[10]On and after Mar. 15, 1997, the class A governance
unitholders of WCB Holdings, other than decedent, were the ISA
Trust, the Children's Trust, the Grandchildren's Trust, and the
QTIP Trust.

into a liquid asset. * * * In order for BFLP to be able to diversify or take any steps other than simply holding the class B membership units, decedent would have had to cause the membership units and the underlying Empak stock to be redeemed.[11] He chose not to do this. By not redeeming the WCB membership units held by BFLP, decedent insured that BFLP would not engage in asset management. Thereby, decedent exercised practical <u>control</u> over BFLP and limited its function to simply holding title to the class B membership units. Whether decedent caused the WCB membership units held by BFLP and the underlying Empak

---

[11]In making that assertion, the majority opinion ignores that, upon the occurrence of a liquidity event with respect to Empak (Empak liquidity event), BFLP, like WCB Holdings, would be in a position to acquire liquid assets with which to engage in economic activity, such as diversifying investments. Until an Empak liquidity event occurred, WCB Holdings owned no assets other than the respective shares of Empak stock transferred to it by decedent and ISA Trust and thus owned no liquid assets with which to engage in any economic activity. Similarly, until an Empak liquidity event occurred, BFLP, whose only asset was WCB Holdings class B membership units, had no liquid assets with which to engage in economic activity, such as diversifying its investments. The reason that during decedent's lifetime BFLP, like WCB Holdings, owned no liquid assets with which to engage in any economic activity is that decedent died unexpectedly on Nov. 16, 1998, before an Empak liquidity event occurred. However, an Empak liquidity event did occur about 19 months after decedent's death. Moreover, as the majority opinion acknowledges with respect to WCB Holdings, many of the steps necessary to position Empak for a liquidity event, and thus necessary to position both WCB Holdings and BFLP to acquire liquid assets as a result of such a liquidity event, were completed before decedent's death. Other such steps were completed after decedent died. Thus, in June 1999, Empak was consolidated with Fluoroware, which resulted in a combined company named Entegris, Inc. (Entegris), and Empak stockholders, including WCB Holdings which owned 90 percent of the outstanding Empak stock, received a 40-percent ownership interest in Entegris. In July 2000, Entegris stock split 2 for 1, and it completed an initial public offering of its stock. As part of that initial public offering, WCB Holdings sold 1,925,000 shares of the approximately 22,000,000 shares of Entegris stock that it owned. Thereafter, WCB Holdings distributed the proceeds of such sales on a pro rata basis to all of the owners of its membership units, including to BFLP.

stock to be redeemed or not, his ability to decide if that event would occur demonstrates the understanding of the parties involved that decedent retained the right to <u>control</u> the units transferred to BFLP.

* * * decedent's transfer to BFLP for a 99-percent ownership interest in the partnership did not alter his <u>control</u> of the WCB Holdings class B membership units transferred to BFLP. * * *

Majority op. pp. 57-59; emphasis added.

As is evident from the foregoing, the majority opinion establishes a "control" standard in applying section 2036(a)(1). However, the majority opinion never actually tells us what it means when it uses the terms "control" or "controlled" four times in the above-quoted excerpt.[12]  Nonetheless, under any commonly accepted meaning of those terms, it is factually incorrect for the majority opinion to conclude that "decedent controlled whether BFLP could transform its * * * class B WCB Holdings membership units * * * into a liquid asset * * * [,] exercised practical control over BFLP and * * * retained the right to control the units transferred to BFLP" and that "decedent's transfer to BFLP * * * did not alter his control of the WCB Holdings class B membership units transferred to BFLP."  Majority op. pp. 57-58.  After decedent and ISA Trust capitalized BFLP, which the majority opinion acknowledges was a validly created and existing partnership under Minnesota law, neither decedent nor

[12]It is not even clear whether in each of the four instances the majority opinion intends the same, or a different, meaning of the terms "control" or "controlled".

ISA Trust had the same relationship to the respective WCB Holdings class B membership units that they transferred to BFLP. Decedent owned a limited partnership interest, and ISA Trust owned a general partnership interest, in BFLP. BFLP, in turn, owned such units transferred to it. Decedent, as a limited partner of BFLP, did not have, and did not exercise, control over BFLP, its assets, its activities, or its general partner, ISA Trust.

In addition to the factual flaws in the majority opinion's rationale, that rationale is logically flawed. It is a non sequitur for the majority opinion to conclude that, because of decedent's alleged ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP, "decedent controlled whether BFLP could transform its * * * class B WCB Holdings membership units * * * into a liquid asset * * * [and] exercised practical control over BFLP". Majority op. pp. 57-58. It also is a non sequitur for the majority opinion to conclude that any such alleged ability "demonstrates the understanding of the parties involved that decedent retained the right to control the units transferred to BFLP" and that his transfer to BFLP of his WCB Holdings class B membership units "did not alter his control" of such units. Majority op. pp. 58-59. The alleged ability of decedent to cause Empak to redeem the

Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP does not logically lead to any of the foregoing conclusions. Nor does any such alleged ability logically lead to the majority opinion's holding that "an implied agreement existed that allowed decedent to retain the enjoyment of the property held by BFLP." Majority op. p. 59.

The majority opinion's rationale is also legally flawed. The language of section 2036(a)(1)[13] "plainly contemplates retention of an attribute of the property transferred--such as a right to income, use of the property itself, or a power of appointment with respect either to income or principal." United States v. Byrum, 408 U.S. at 149. Moreover, the term "enjoyment" used in section 2036(a)(1) is not a term or art; it "connote[s] substantial present economic benefit". Id. at 145. Decedent did not retain any attribute of the WCB Holdings class B membership units that he transferred to BFLP. Nor was decedent's alleged ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP a substantial present economic benefit of such units. Any such alleged ability was not

---

[13]In order for sec. 2036(a)(1) to apply, decedent must have, inter alia, made a transfer of property under which he "retained for his life * * * (1) the possession or enjoyment of, or the right to the income from, the property".

a present benefit at all; it was "a speculative and contingent benefit which may or may not * * * [have been] realized."[14]  Id. at 150.  There simply are no circumstances surrounding decedent's transfer of his WCB Holdings class B membership units to BFLP and no subsequent use of such units by decedent from which an implied agreement may be inferred that decedent retained the enjoyment of such units.  See Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000).  Section 2036(a)(1) rejects the majority opinion's holding that decedent retained the enjoyment of the WCB Holdings class B membership units that he transferred to BFLP.

The legal flaws in the majority opinion's rationale are not limited to its disregard of section 2036(a)(1), which, as indicated above, the Supreme Court construed according to its plain language.  See United States v. Byrum, supra at 145, 149. That rationale also ignores the principles under section 2036(a) that the Supreme Court established in Byrum and that this Court has applied in other cases.  See, e.g., Estate of Cohen v. Commissioner, 79 T.C. 1015 (1982); Estate of Gilman v.

---

[14]It is noteworthy that any speculative and contingent future benefit (i.e., diversification of BFLP's assets) that decedent might have received from his alleged ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP was substantially more tenuous than the contingent and speculative future benefits that Mr. Byrum might have received from his power to liquidate or merge the corporations involved in United States v. Byrum, 408 U.S. 125 (1972).

Commissioner, 65 T.C. 296 (1975), affd. per curiam 547 F.2d 32 (2d Cir. 1976).  In Byrum, the decedent Milliken C. Byrum (Mr. Byrum) transferred to an irrevocable trust that he created shares of stock in each of three closely held corporations.  Prior to the transfer, Mr. Byrum owned at least 71 percent of the outstanding stock of each corporation.  The beneficiaries of the trust that Mr. Byrum created were his children or, in the event of their death before termination of the trust, their surviving children.  The trust instrument specified that there was to be a corporate trustee, and Mr. Byrum designated an independent corporation as sole trustee.  The trust instrument vested in the trustee broad and detailed powers with respect to the control and management of the trust property.  Such powers of the trustee were exercisable in the trustee's sole discretion, subject to the following rights reserved by Mr. Byrum:  (1) To vote the shares of unlisted stock held in the trust; (2) to disapprove the sale or transfer of any trust assets, including the shares transferred to the trust; (3) to approve investments and reinvestments; and (4) to remove the trustee and to designate another corporate trustee to serve as successor trustee.  United States v. Byrum, supra at 126-127.

The Government's principal argument in Byrum was that, by retaining voting control over the corporations whose stock he transferred to the trust, which the Government maintained gave

him, inter alia, control over the dividend policy of such corporations, Mr. Byrum retained the right under section 2036(a)(2) to designate the persons who were to enjoy the income from the transferred property.  Id. at 131-132.  The Government's alternative argument was that, by retaining voting control over the corporations whose stock he transferred to the trust, which gave him, inter alia, the power to determine whether and when such corporations would be liquidated or merged, Mr. Byrum retained under section 2036(a)(1) the enjoyment of the transferred property.  Id. at 145.

The Supreme Court rejected the Government's principal argument under section 2036(a)(2) and its alternative argument under section 2036(a)(1), both of which were based on a "control" standard advanced by the Government.  In rejecting the Government's arguments, the Supreme Court expressly rejected the use of a "control" standard as "the basis per se" in applying section 2036(a).  The Supreme Court concluded:

> The "control" rationale, urged by the Government * * *, would create a standard--not specified in the statute-- so vague and amorphous as to be impossible of ascertainment in many instances. * * *

> *      *      *      *      *      *      *

> The Government uses the terms "control" and "controlling stockholder" as if they were words of art with a fixed and ascertainable meaning.  In fact, the concept of "control" is a nebulous one.  Although in this case Byrum possessed "voting control" of the three corporations (in view of his being able to vote more than 50% of the stock in each), the concept is too

> variable and imprecise to constitute the basis per se
> for imposing tax liability under § 2036(a). * * *

Id. at 137 n.10 and 138 n.13.

The majority opinion's reliance on a "control" standard in applying section 2036(a)(1) flies in the face of the Supreme Court's rejection of such a standard.[15] Id. The "control" standard in the majority opinion's rationale, like the Government's "control" standard in Byrum, is "too variable and imprecise to constitute the basis per se", id. at 138 n.13, in applying section 2036(a)(1).[16]

Not only does the majority opinion's rationale fly in the face of the Supreme Court's rejection in United States v. Byrum, 408 U.S. 125, of a "control" standard under section 2036(a), that rationale also flies in the face of other principles under section 2036(a) that the Supreme Court established in Byrum,

---

[15]Under the majority opinion's "control" standard, because of decedent's alleged ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP, "decedent controlled whether BFLP could transform its * * * class B WCB Holdings membership units * * * into a liquid asset * * *[,] exercised practical control over BFLP and * * * retained the right to control the units transferred to BFLP", and his transfer to BFLP of his WCB Holdings class B membership units "did not alter his control" of such units. Majority op. pp. 57-59. Consequently, according to the majority opinion, "an implied agreement existed that allowed decedent to retain the enjoyment of the property held by BFLP." Majority op. p. 59.

[16]As discussed above, we do not even know, because the majority opinion never tells us, what it intends by the terms "control" and "controlled" that appear in the majority opinion's rationale.

including those set forth in the following excerpt from the

Supreme Court's rejection of the Government's arguments in that

case:

> At the outset we observe that this Court has never held that trust property must be included in a settlor's gross estate solely because the settlor retained the power to manage trust assets. * * *

> * * * * * * *

> * * * The term "right," certainly when used in a tax statute, must be given its normal and customary meaning. It connotes an ascertainable and legally enforceable power * * *. Here, the right ascribed to Byrum was the power to use his majority position and influence over the corporate directors to "regulate the flow of dividends" to the trust. That "right" was neither ascertainable nor legally enforceable and hence was not a right in any normal sense of that term.

> Byrum did retain the legal right to vote shares held by the trust and to veto investments and reinvestments. But the corporate trustee alone, not Byrum, had the right to pay out or withhold income and thereby to designate who among the beneficiaries enjoyed such income. Whatever power Byrum may have possessed with respect to the flow of income into the trust was derived not from an enforceable legal right specified in the trust instrument, but from the fact that he could elect a majority of the directors of the three corporations. The power to elect the directors conferred no legal right to command them to pay or not to pay dividends. A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests. Moreover, the directors also have a fiduciary duty to promote the interests of the corporation. * * * their [the corporate directors'] responsibilities were to all stockholders and were enforceable according to legal standards entirely unrelated to the needs of the trust or to Byrum's desires with respect thereto.

> The Government seeks to equate the de facto position of a controlling stockholder with the legally

enforceable "right" specified by the statute. Retention of corporate control (through the right to vote the shares) is said to be "tantamount to the power to accumulate income" in the trust * * *.  The Government goes on to assert that "[t]hrough exercise of that retained power, [Byrum] could increase or decrease corporate dividends * * * and thereby shift or defer the beneficial enjoyment of trust income."  This approach seems to us not only to depart from the specific statutory language, but also to misconceive the realities of corporate life.

*       *       *       *       *       *       *

We conclude that Byrum did not have an unconstrained de facto power to regulate the flow of dividends to the trust, much less the "right" to designate who was to enjoy the income from trust property.  His ability to affect, but not control, trust income, was a qualitatively different power from that of the settlor in [United States v.] O'Malley [383 U.S. 627 (1966)], who had a specific and enforceable right [set forth in the controlling trust instrument] to control the income paid to the beneficiaries.  Even had Byrum managed to flood the trust with income, he had no way of compelling the trustee to pay it out rather than accumulate it.  Nor could he prevent the trustee from making payments from other trust assets * * *.

*       *       *       *       *       *       *

It is well settled that the terms "enjoy" and "enjoyment," as used in various estate tax statutes, "are not terms of art, but connote substantial present economic benefit rather than technical vesting of title or estates." * * *

*       *       *       *       *       *       *

* * * The statutory language [of section 2036(a)(1)] plainly contemplates retention of an attribute of the property transferred--such as a right to income, use of the property itself, or a power of appointment with respect either to income or principal.

Even if Byrum had transferred a majority of the

stock, but had retained voting control, he would not have retained "substantial present economic benefit," * * *.  The Government points to the retention of two "benefits."  The first of these, the power to liquidate or merge, is not a <u>present</u> benefit; rather, it is a speculative and contingent benefit which may or may not be realized. * * *

<u>United States v. Byrum</u>, 408 U.S. at 132-133, 136-139, 143, 145, 149-150; fn. refs. omitted.

The Supreme Court teaches us in <u>United States v. Byrum</u>, 408 U.S. 125 (1972), that section 2036(a)(1) (and section 2036(a)(2)) does not apply to a transfer by an individual to an irrevocable trust of shares of stock in certain corporations in which the transferor owned stock,[17] where such ownership gave the transferor the ability, inter alia, to liquidate or merge such corporations and where the powers of the independent trustee of such trust were subject to the following rights expressly reserved by the transferor:  (1) To vote the shares of unlisted stock held in the trust; (2) to disapprove the sale or transfer of any trust

---

[17]After the Supreme Court decided <u>United States v. Byrum</u>, 408 U.S. 125 (1972), Congress enacted sec. 2036(b), which is applicable to transfers made after June 22, 1976.  Sec. 2036(b) expands the meaning of the phrase "retained * * * enjoyment of" the transferred property for purposes of sec. 2036(a)(1).  However, sec. 2036(b) is expressly limited to the retained right to vote shares of stock of a controlled corporation, as defined in sec. 2036(b)(2), and has no application to decedent's transfer to BFLP of his nonvoting WCB Holdings class B membership units.  Thus, the effect of <u>Byrum</u> on the instant case is unchanged by the enactment of sec. 2036(b).  See Rev. Rul. 81-15, 1981-1 C.B. 457, 458, where the Internal Revenue Service, in reliance on the legislative history of sec. 2036(b), acknowledged that "the effect of <u>Byrum</u> * * * is not changed by the enactment of section 2036(b)" in the case of a transfer of nonvoting stock.

assets, including the shares transferred to the trust; (3) to approve investments and reinvestments; and (4) to remove the trustee and to designate another corporate trustee to serve as successor trustee. Id. at 126-127.

A fortiori, under the principles that the Supreme Court established in United States v. Byrum, supra, even if in the instant case decedent had the ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP, any such ability does not demonstrate, and did not result in, decedent's retention of the enjoyment of the WCB Holdings class B membership units that he transferred to BFLP within the meaning of section 2036(a)(1).[18] In reaching a contrary holding,

---

[18]Although there are factual differences between United States v. Byrum, supra, and the instant case, those differences have no significance for purposes of determining whether sec. 2036(a)(1) applies to decedent's transfer to BFLP of his WCB Holdings class B membership units. In fact, many of those differences strengthen the estate's position in the instant case. For example, in Byrum, Mr. Byrum expressly reserved the rights, inter alia, to disapprove the sale or transfer of any trust assets including the shares transferred to the trust, to approve investments and reinvestments of the trust, and to remove the trustee and designate another corporate trustee to serve as successor trustee. Id. at 127. In contrast, decedent in the instant case reserved no such rights, or any other rights, with respect to BFLP, BFLP's assets, or ISA Trust, BFLP's general partner.

Moreover, any suggestion that the principles announced by the Supreme Court in United States v. Byrum, supra, are limited to trusts, and do not apply to other types of entities such as limited partnerships like BFLP, is unfounded and disregards the

(continued...)

the majority opinion loses sight of, or chooses to disregard, the fact that any such ability is qualitatively different from the retention of the enjoyment (i.e., substantial present economic benefit, id. at 145) of the WCB Holdings class B units that he transferred to BFLP. See id. at 143, 145. In this connection, assuming arguendo the propriety of the majority opinion's conclusions that decedent had the ability to cause Empak to redeem the Empak stock owned by WCB Holdings and to cause WCB Holdings to redeem the WCB Holdings class B membership units owned by BFLP, any such ability does not demonstrate, and did not result in, the retention by decedent of the right to compel BFLP or ISA Trust, the general partner of BFLP, to distribute such units to or on behalf of decedent or otherwise to permit decedent to have substantial present economic benefit of such units.

The majority opinion not only fails to apply section

---

[18](...continued)
respective fiduciary duties of the partners of a partnership to each other and to the partnership (discussed below). In fact, respondent has acknowledged in, inter alia, certain private letter rulings that those principles apply to limited partnerships. See, e.g., Priv. Ltr. Rul. 95-46-006 (Aug. 14, 1995); Priv. Ltr. Rul. 94-15-007 (Jan. 12, 1994); Priv. Ltr. Rul. 93-10-039 (Dec. 16, 1992). Although private letter rulings have no precedential effect, see sec. 6110(k)(3), they "are an instructive tool", Thom v. United States, 283 F.3d 939, 943 n.6 (8th Cir. 2002), and "do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws", Hanover Bank v. Commissioner, 369 U.S. 672, 686 (1962); see also Wells Fargo & Co. & Subs. v. Commissioner, 224 F.3d 874, 886 (8th Cir. 2000), affg. in part and revg. in part Norwest Corp. v. Commissioner, 112 T.C. 89 (1999).

2036(a)(1) and principles under section 2036(a) that the Supreme Count established in <u>United States v. Byrum</u>, <u>supra</u>, it also fails to apply principles established by Minnesota law regarding the fiduciary duties of the partners of partnerships and the trustees of trusts, which the majority opinion acknowledges exist.[19]  This is evidenced by the following passage from the majority opinion's rationale:

> The estate's argument that the general partner's fiduciary duties prevents a finding of an implied agreement is overcome by the lack of activity following BFLP's formation and BFLP's failure to perform any meaningful functions as an entity.  We conclude that decedent's transfer to BFLP for a 99-percent ownership interest in the partnership did not alter his control of the WCB Holdings class B membership units transferred to BFLP. * * *

---

[19]The majority opinion acknowledges:

Under Minnesota law, the relationship of partners is fiduciary in character, and each partner owes the other partners the highest degree of integrity, loyalty, and good faith.  <u>Prince v. Sonnesyn</u>, 222 Minn. 528, 535 (1946); <u>Margeson v. Margeson</u>, 376 N.W.2d 269 (Minn. Ct. App. 1985).  In a limited partnership, a general partner can be liable to the limited partners for breach of fiduciary duty.  Minn. Stat. Ann. sec. 322A.33 (West 2004); see also Minn. Stat. Ann. sec. 323.20 (West 1995), repealed by Laws 1997, ch. 174, art. 12, sec. 68, effective Jan. 1, 2002, but replaced by Minn. Stat. Ann. secs. 323A.4-04 and 323A.4-05, effective Jan. 1, 1999 (West 2004).  In addition, the ISA Trust trustees owed fiduciary duties to its beneficiaries.  See Minn. Stat. Ann. sec. 501B.10 (West. Supp. 1990), repealed by Laws 1996, ch. 314, sec. 8, eff. Jan. 1, 1997, replaced by Minn. Stat. Ann. sec. 501B.151, effective Jan. 1, 1997 (West 2002 & Supp. 2004); Minn. Stat. Ann. sec. 501B.60 (West 1990).

Majority op. p. 59 note 12.

Majority op. pp. 58-59; fn. ref. omitted.

The majority opinion cites nothing in Minnesota law that supports the above-quoted conclusions. Irrespective of any "lack of activity" following BFLP's formation and any "failure [by BFLP] to perform any meaningful functions", majority op. pp. 58-59, ISA Trust, as the general partner of BFLP, owed fiduciary duties to decedent, and decedent, as a limited partner of BFLP, owed fiduciary duties to ISA Trust. Majority op. p. 59 note 12. ISA Trust, as the general partner of BFLP, and decedent, as a limited partner of BFLP, also owed fiduciary duties to BFLP. Margeson v. Margeson, 376 N.W.2d 269, 272 (Minn. Ct. App. 1985). In addition, the trustees of ISA trust owed fiduciary duties to the beneficiaries of that trust. Majority op. p. 59 note 12. The majority opinion points to nothing in Minnesota law that relieved decedent, ISA Trust, and its trustees of their respective fiduciary duties because of BFLP's "lack of activity" or "failure to perform any meaningful functions" during decedent's lifetime. Majority op. pp. 58-59. ISA Trust and decedent would be breaching their respective fiduciary duties to each other and to BFLP, and the trustees of ISA Trust would be breaching their fiduciary duties to the beneficiaries of that trust, if they were to allow decedent to retain, as the majority opinion concludes he did, "control over BFLP" and "control [over] the units transferred to BFLP", majority op. p. 58, and if, as

the majority opinion also concludes, decedent's transfer to BFLP for a 99-percent ownership interest in that partnership "did not alter his control of * * * [such] units", majority op. p. 59.

In conclusion, the majority opinion is wrong in holding, and section 2036(a)(1) and <u>United States v. Byrum</u>, 408 U.S. 125 (1972), reject the majority opinion's holdings, that "an implied agreement existed that allowed decedent to retain enjoyment of the property held by BFLP", majority op. p. 59, within the meaning of section 2036(a)(1) and that that section applies to decedent's transfer to BFLP of his WCB Holdings class B membership units.

WELLS and FOLEY, <u>JJ</u>., agree with this concurring in part and dissenting in part opinion.